**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Martin F. HOGAN,**
**Defendant–Appellant.**

**No. 88–3116.**

United States Court of Appeals,
Seventh Circuit.

Argued May 26, 1989.
Decided Oct. 13, 1989.

sistencies to conform to the record and Friedman's objections in this respect are unavailing.

Thomas M. Durkin, Scott T. Mendeloff, Asst. U.S. Attys., Office of the U.S. Atty., Chicago, Ill., for U.S.

Patrick A. Tuite, Tuite, Mejia & Giacchetti, Chicago, Ill., for Martin Hogan.

Before WOOD, Jr., MANION, and KANNE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Defendant-appellant Martin F. Hogan, Jr. was an associate judge for the First Municipal District of the Circuit Court of Cook County. He was assigned to Branch 64, known informally as Auto Court, from approximately May 1981 to June 1983. A jury found that it was in this capacity as the presiding judge in Branch 64, and occasionally Branch 29, that he had committed the crimes of bribery, the aiding and abetting of bribery, and conspiracy to engage in bribery in violation of the Racketeer Influenced and Corrupt Organizations (RICO) statutes. 18 U.S.C. §§ 1961–1968. The jury also convicted him of filing false tax returns. 26 U.S.C. § 7206(1). He now appeals his conviction. We affirm.

## I. FACTUAL BACKGROUND

On October 16, 1987 a federal grand jury indicted Hogan and five codefendants for racketeering, racketeering conspiracy, and the filing of false tax returns.[1] The district court granted Hogan's motion for a separate trial, and on August 9, 1988 a three-week trial commenced in which Hogan was the sole defendant. We begin by describing the general framework of the bribery scheme as presented by the government and add details pertinent to specific issues as we address them.

According to the government, Judge Hogan entered a court system that was notable for the zeal with which some of its members embraced pay-offs and bribery, rather than their allegiance to justice. Under the watchful eye of Chief Judge Richard LeFevour,[2] five attorneys and the Chief Judge's cousin, police officer James LeFevour, devised a plan that would allow the attorneys to solicit legal business in the First Municipal courtrooms in return for a monthly fee paid to the Chief Judge.

Ironically, they devised this plan in response to an expose in the *Chicago Lawyer*

---

1. The grand jury subsequently returned two superseding indictments. Hogan was ultimately convicted under the second superseding indictment. The manner in which Hogan was indicted is not at issue on appeal.

2. Chief Judge LeFevour was convicted of violating the RICO statutes, committing mail fraud, and filing false income tax returns and sentenced to twelve years in prison. We affirmed his conviction in *United States v. LeFevour,* 798 F.2d 977 (7th Cir.1986).

magazine titled "Hustling." "Hustling" in the legal profession connotes the practice of directly approaching defendants and asking them if they need legal representation. The court rules and ethics code prohibited attorneys from hustling, and the *Chicago Lawyer* article criticized the prevalence of the unethical practice in the Cook County Circuit courts. *See* Rule 0.5(a) of the Circuit Court of Cook County; Ill.Rev. Stat. ch. 110A, Rule 2–103.

Although Judge LeFevour had willingly permitted hustling during his tenure at Traffic Court (presumably because attorneys paid him money to ignore their activities), he was cut off from the action when he was promoted to chief judge. The article gave him the means to "put the squeeze" on the hustling attorneys, and he righteously ordered his cousin, assigned to police officer duties in the First Municipal courtrooms, to stop the lawyers from hustling. James LeFevour began to hassle the hustlers who loitered in the hallways outside the First Municipal courtrooms. Eventually, the persistent harassment convinced five lawyers, who later became known as the Hustlers' Club, to pay Chief Judge LeFevour through his cousin James to leave them alone.[3] James was known in the court system as Judge LeFevour's "bagman" and, in that noble capacity, he agreed to carry the money to Chief Judge LeFevour.

In return for the monthly payments, Chief Judge LeFevour agreed to assign to the "high volume" First Municipal courtrooms those judges who would allow the attorneys to hustle and generally treat the attorneys favorably.[4] At trial, various participants in the plan testified that willing judges would "steer" defendants who could afford to make bond but lacked legal representation to the attorneys, ignore the hustling that took place in the courtroom, and generally rule in favor of the attorneys' clients. The attorneys would then on "good days" (days on which the attorneys made a certain percentage of money through hustling and steering) "see" the sitting judges and leave a small payment of $100–$200 for them.

Enter Judge Hogan. Judge Hogan, a young appointee to the bench at the age of thirty-nine, quickly learned the ways of the First Municipal courts under Chief Judge LeFevour's tutelage. Chief Judge LeFevour appointed Judge Hogan to Branch 64 soon after the system of bribe payments was set up, and James LeFevour visited Judge Hogan to explain the plan. James LeFevour told Judge Hogan that Chief Judge LeFevour said that the five attorneys who paid him monthly should be permitted to hustle in Branch 64. He also told Judge Hogan that Neal Birnbaum promised that the lawyers would "see" the sitting judges after they made a certain profit, to which Judge Hogan replied "fine."

Neal Birnbaum, Martin Schachter, and Lee Barnett, three members of the Hustlers' Club, testified that, in keeping with the plan, they each paid Judge Hogan sums of approximately $100–$200 between 1981 and 1983. Neal Birnbaum paid Judge Hogan approximately $100 on ten different occasions; during that time Neal Birnbaum won on each of eleven contested motions argued before him. Likewise, Lee Barnett paid Judge Hogan $100 on two occasions, for which, Barnett testified, the judge steered cases to him and ignored his hustling. Martin Schachter testified that he paid Judge Hogan $100–$200 approximately twelve times. He described the technique that he and Judge Hogan had developed for making most of the payments. The judge would walk to the door of his chambers and look out over the courtroom.

---

**3.** Neal Birnbaum, Martin Schachter, and Lee Barnett, three members of the Hustlers' Club, testified that they initially turned over $500 per person each month to James LeFevour but later reduced that amount to $250 because of competition from other attorneys in the courtrooms.

**4.** Chief Judge LeFevour was only partially successful. Numerous witnesses testified that

Judge Odas Nicholson, assigned to Branch 40, prohibited attorneys from hustling in her courtroom. Judge Thaddeus Kowalski, assigned to several First Municipal courtrooms, also testified that he attempted to rid his courtroom of hustling. We do not suggest that all judges in the First Municipal courts were parties to the activities supervised by Chief Judge LeFevour.

Schachter would then ask, "Are things clear?" When Judge Hogan replied affirmatively, Schachter would place the money in the judge's desk drawer and Judge Hogan would often respond with a "thank you."

These three members of the Hustlers' Club were not the only persons who testified that they paid Judge Hogan. Police officer Francis Chimpoulis, who was the court sergeant in Branch 64, stated that he carried white envelopes and cash from an attorney who practiced in Branch 64 to Judge Hogan on four to six occasions in return for $10–$20 for himself. Judge Hogan also received additional visits from James LeFevour. James LeFevour testified that at three different times he visited Judge Hogan and informed him that "Judge LeFevour [is] interested in this case." Government witnesses testified that this meant that Judge Hogan was to treat the defendant favorably. James LeFevour stated that on one of these three visits he slipped $100–$200 in Judge Hogan's coatpocket and informed Judge Hogan that he had left something in his coat hanging in the Branch 64 chambers, to which Judge Hogan replied, "fine."

The first time James LeFevour visited Judge Hogan involved an attorney named Dean Wolfson. Wolfson had approached James LeFevour in the summer or fall of 1981 and asked James LeFevour to speak to Judge Hogan about the case, for which Wolfson would pay Chief Judge LeFevour through cousin James. When James LeFevour told Judge Hogan that the chief judge was interested in the case, Judge Hogan responded, "all right." Judge Hogan ruled in Wolfson's client's favor and Wolfson paid James LeFevour $550 after the case was resolved.

The second and third incidents involved undercover FBI agent Terry Hake. In Oc-

tober 1982 Terry Hake, then posing as a corrupt defense attorney, told James LeFevour that he needed a stolen auto case "disposed of." After James LeFevour spoke to Judge Hogan and Judge Hogan dismissed the case as Terry Hake requested, Terry Hake paid James LeFevour $500 in the washroom next to Branch 64. Similarly, in December 1982 Terry Hake informed James LeFevour that he needed Judge Hogan to find his client not guilty in a criminal trespass to auto case. James LeFevour visited Judge Hogan; Judge Hogan responded to LeFevour's comments by stating that "he would see what he could do." At the trial James LeFevour stood approximately five feet behind the bench as Judge Hogan proceeded to find Terry Hake's client not guilty. Terry Hake then paid James LeFevour $400.

With regard to the tax charges, the government presented evidence that from 1981 to 1983 Judge Hogan reported income only from his judicial salary and savings account interest. Using a cash method, the government calculated that Judge Hogan's unreported income in 1981 was $2,370. In 1982 it was $4,775.74 and in 1983 it totalled $13,367.48.

On August 29, 1988 the jury convicted Hogan[5] on all five counts of the indictment. The district court sentenced Hogan to ten years in prison on Counts 1 and 2 (the substantive RICO charge and the conspiracy count) to run concurrently, and five years probation on Counts 7, 8, and 9 (the tax fraud charges) to run consecutive to the sentence.

## II. DISCUSSION

Hogan raises five distinct issues on appeal. He first contests his conviction with regard to three charges of aiding and abetting the commission of a bribe, Racketeering Acts 4, 6, and 7 of the RICO count.[6]

---

**5.** Hogan was relieved of his duties as an associate judge in the Cook County circuit courts in June 1987.

**6.** Hogan is not attempting to obtain a reversal on the RICO conviction. He concedes that the jury found two or more predicate acts, independent of the acts challenged, needed to support a

RICO charge. *See United States v. Holzer,* 840 F.2d 1343, 1350–51 (7th Cir.1988). He suggests, however, that a finding of error with regard to Acts 4, 6, and 7 might influence the district court to reconsider his sentence.

He argues that the district court improperly admitted tape-recorded conversations under the co-conspirator exception to the hearsay rule and failed to sever the tax counts from the underlying RICO counts. He also challenges the method used by the government to prove Hogan's unpaid tax liability. Finally, he disagrees with the district court's decision to exclude as hearsay the testimony of Tempel (Tim) Smith, Jr., a friend and witness for Hogan.

## A. Aiding and Abetting the Commission of a Bribe

Hogan challenges Racketeering Acts 4, 6, and 7 of Count 2, which include the three charges of aiding and abetting bribe activity involving Dean Wolfson, Terry Hake, and James LeFevour. According to Hogan, the evidence did not sufficiently establish that he knew that Dean Wolfson and Terry Hake paid the LeFevours bribes in connection with three cases upon which he ruled in their favor. Hogan argues that, without knowledge that money changed hands, he did not aid and abet bribery as defined by state law. He also contends that under Illinois law, he is not accountable for facilitating bribes because his conduct was "inevitably incident" to the commission of the bribe. We will address Hogan's challenge to the sufficiency of the evidence first.

### 1. Sufficiency of the Evidence

■ In assessing a challenge to the sufficiency of the evidence, we review the evidence in the light most favorable to the prosecution and draw all reasonable inferences in its favor. *United States v. Douglas*, 874 F.2d 1145, 1151 (7th Cir.1989). "If *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," we must affirm. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in the original); *see also United States v. Floyd*, 882 F.2d 235, 239 (7th Cir.1989). Because Hogan received a jury trial, we must on review defer to reasonable inferences drawn by the jury and the weight it gave to the evidence. *United States v. Draiman*, 784 F.2d 248, 251 (7th

Cir.1986). Likewise, we leave the credibility of witnesses solely to the jury's evaluation, absent extraordinary circumstances. *United States v. Muskovsky*, 863 F.2d 1319, 1322 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1345, 103 L.Ed.2d 813 (1989).

Hogan claims that he had no knowledge that the LeFevours financially benefitted when he ruled in favor of Dean Wolfson's and Terry Hake's clients. He contends that he believed that Chief Judge LeFevour was concerned about the outcome of the cases and that James LeFevour's comment that the chief judge was "interested in the case" was an informal "character reference" for the defendant. Emphasizing only the testimony of James LeFevour and Terry Hake, he asserts that the government failed to establish that he knew about the bribe.

As Hogan has insisted, to convict a defendant for facilitating a bribe, the government must show that the defendant had the requisite intent and that something of value changed hands. In Illinois, a defendant is legally accountable for an act of bribery committed by another if he intends to promote or to facilitate the commission of the bribe and aids or abets the person in its commission. *See* Ill.Rev.Stat. ch. 38, ¶¶ 5–2, 33–1. To convict a defendant of the underlying charge of bribery, a jury must find that "property or personal advantage" was tendered to a potential bribe-taker. Ill.Rev.Stat. ch. 38, ¶ 33–1.

Although Hogan accurately restates the law, he ignores the circumstantial evidence presented at trial that could have led a reasonable juror to conclude that he knew that the LeFevours accepted money from Dean Wolfson and Terry Hake. Several witnesses at trial attested to James LeFevour's reputation as a "bagman" for Chief Judge LeFevour; a term they defined as someone who carried bribes to a judge for attorneys. Martin Schachter testified that he had discussed with Judge Hogan three or four times James LeFevour's relationship with the hustling attorneys and complained that James LeFevour was not "do-

ing his job" because he did not prevent the nonpaying attorneys from taking away the hustlers' business. Neil Birnbaum stated that Martin Schachter told him that Schachter had mentioned the bribery arrangement to Judge Hogan. James LeFevour explained to Judge Hogan that five members of the Hustlers' Club would hustle in Branch 64 and "see" Judge Hogan occasionally. This evidence indicates that Hogan knew that James LeFevour carried money to Chief Judge LeFevour for several attorneys and that, between the LeFevours and the attorneys, a bribery relationship had been established.

Hogan compares his knowledge to that of the employee-defendants in *Ingram v. United States*, 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959). In *Ingram* the Supreme Court held that the evidence was insufficient to establish that two employees in a gambling conspiracy knew that their employers had also unlawfully withheld income tax. The government in *Ingram* cited the employees' connection to the gambling business, the secrecy of their conduct, and their knowledge that the business was profitable as evidence that they knowingly withheld taxes, but the Supreme Court rejected the evidence because the inferences were too remote. *See id.* at 678–79, 79 S.Ct. at 1319–20. Unlike the prosecutor in *Ingram* who failed to show that the employees knew anything about the tax liability of the gambling operation, the government demonstrated that Judge Hogan was aware of a bribery scheme involving the LeFevours. The jury need not infer Hogan's knowledge of the Wolfson and Hake payments from his knowledge of a tangential illegal activity, but from his knowledge of bribery that was taking place in the First Municipal courts. The inference that Hogan knew that the LeFevours accepted bribes from Dean Wolfson and Terry Hake is not remote or tenuous as it was in *Ingram*.

Furthermore, Judge Hogan's own bribe-taking activities suggest that he was aware that money was the means to obtaining favorable treatment in a courtroom. Judge Hogan knew what a "bagman" was because he himself had one in the person of Francis Chimpoulis. Judge Hogan knew that money was paid for favorable treatment because he himself took money from attorneys and steered cases to them in return. In fact, James LeFevour insisted that he slipped $100–$200 into Judge Hogan's coatpocket for his favoritism in one of the three cases involving Terry Hake and Dean Wolfson. This evidence indicates that Hogan knew that judges were often compensated for favoritism.

Finally, Judge Hogan knew that James LeFevour and the bribing attorneys expected him to give them favorable treatment. James LeFevour testified that he told Judge Hogan that Chief Judge LeFevour was "interested" in the Wolfson and Hake cases and, at one point, even hovered next to the judge's bench to ensure that Judge Hogan treated Terry Hake favorably. Hogan himself admitted that he remembered two of these conversations.

The evidence established that Hogan knew that attorneys were systematically paying bribes to the LeFevours, that bribes were given for favoritism in the courtroom, and that he was expected to rule favorably in the Wolfson and Hake cases. Based on these facts, a reasonable jury could infer that Hogan knew that Terry Hake and Dean Wolfson paid the LeFevours money in return for favorable treatment.

2. Accountability

█ Hogan argues that, even if there is sufficient evidence to show that he had knowledge of the bribe payments, he is not accountable for facilitating bribes under Illinois law. The Illinois statutes provide that a person is not legally accountable for the conduct of another if "the offense is so defined that his conduct of another if "the offense is so defined that his conduct was inevitably incident to its commission." Ill. Rev.Stat. ch. 38, ¶ 5–2(c)(2). Hogan argues that his conduct was "inevitably incident" to the commission of a bribe because, without his favorable rulings in the Wolfson and Hake cases, the elements of a bribe would not have been satisfied.

Unfortunately for Hogan, a defendant may not claim that his conduct was "inevitably incident" to the offense if the statute is written to include the incidental conduct. The law may be extended, for example, to a bribe-taker as well as a bribe-giver. As the Committee Comments explain:

> Should a bribe-taker be guilty of bribery? ... In many situations, the scope of criminal liability, if extended in this fashion, might make law enforcement more difficult. In any event, subsections (c)(1) and (c)(2) do not prevent the extension of liability to such persons by provision in the particular statutes if this is desired. Thus, if it be decided that a bribe-taker should be treated as guilty of bribery, this can be provided in the bribery section.

Ill.Rev.Stat. ch. 38, ¶ 5-2 (Committee Comments). The Illinois bribery statute covers both persons receiving and giving bribes. Ill.Rev.Stat. ch. 38, ¶ 33-1(a), (d). Obviously the Illinois legislature intended for the law to apply to each aspect of the bribery act but failed to envision the creative methods used by Judge Hogan to advance the bribe transactions. Nevertheless, Hogan placed himself in the shoes of the bribe-taker, who is explicitly covered by the statute, when he showed partiality toward the Hake and Wolfson defendants. He aided and abetted the bribe-taker by permitting himself to be influenced in his position as a judge. The Illinois bribery statute explicitly prohibits a bribe-taker from taking money in return for favoritism. *See* Ill.Rev. Stat. ch. 38, ¶ 33-1(d). Hogan's conduct is specifically prohibited by the bribery statute and therefore comes within the scope of the statute. Where the statute covers the incidental conduct, the "inevitably incident" defense does not apply.

### B. Admission of Tape-recorded Conversations

■ Hogan argues that the district court erred when it admitted into evidence as nonhearsay tape recordings of two conversations between Terry Hake and an attorney named Harlan Becker. On October 14, 1982 Harlan Becker spoke to Terry Hake about James LeFevour and suggested that LeFevour might try to pocket the bribe that Terry Hake had just paid to LeFevour and intended for Judge Hogan.[7] Harlan Becker stated that if Terry Hake had given him the money he would have ensured that the judge "got it all." In the second conversation on November 12, 1982 Becker again warned Terry Hake that James LeFevour would pocket bribes intended for the judges.

Hogan contends that the government failed to allege, charge, or prove that he and Harlan Becker were co-conspirators. He argues that, at most, the government established that he and Becker were members of a conspiracy to pay bribes for the privileges of hustling and steering. He claims that the government did not establish that they had conspired to "fix" cases.

The district court allowed the government to play the recorded conversations between Terry Hake and Harlan Becker pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence. Rule 801(d)(2)(E) provides that statements by a co-conspirator during and in furtherance of the conspiracy are not hearsay. To satisfy Rule 801(d)(2)(E), the government must show (1) that a conspiracy existed; (2) that the defendant and declarant were members of the conspiracy; and (3) that the offered statement was made during the course of and in furtherance of the conspiracy. *United States v. Hooks*, 848 F.2d 785, 794 (7th Cir.1988). On review of a district court's findings regarding the existence of these elements, we will reverse only if the findings are clearly erroneous. *Id.* at 794.

Contrary to Hogan's assertions, the government adequately alleged and charged in Count 1 that Hogan conspired with Harlan Becker to be influenced in the performance of his duties as a judge in exchange for bribes. This description of the conspiracy adequately includes the activity of "fixing" cases. Although Harlan

---

7. Becker referred to the judge as "he" on the tapes and the district court refused to let Terry Hake speculate on who Harlan Becker meant by "he." The inference most favorable to the government, however, is that Harlan Becker was referring to Judge Hogan.

Becker was not specifically named as a member of the conspiracy in Count 1, the indictment stated that Hogan conspired with both unknown and known co-conspirators. Further, Count 1 incorporated by reference Count 4 of the indictment, which identified Harlan Becker as a member of the conspiracy and described his conversation with Terry Hake. Although slightly circumspect in its approach, the government adequately alleged and charged that Hogan conspired with Harlan Becker to provide favoritism in his judicial decision-making in exchange for bribes.

Likewise, the government sufficiently proved that Harlan Becker and Hogan were co-conspirators. If in dispute, the government must prove that a conspiracy existed between the declarant and the defendant by a preponderance of the evidence. *Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987). Because conspiracies are secretive by nature, the government often must rely on circumstantial evidence. *United States v. Mealy,* 851 F.2d 890, 896 (7th Cir.1988). Circumstantial evidence and reasonable inferences drawn therefrom may serve as proof. *Id.* The district court may also consider the alleged hearsay to determine whether a conspiracy existed between the out-of-court declarant and the defendant. *Bourjaily,* 483 U.S. at 177–78, 107 S.Ct. at 2779–80.

Although the evidence that Hogan and Harlan Becker were members of the same conspiracy was not overwhelming, we find that the district court did not clearly err by admitting the tape-recorded conversations. "The parties involved in a conspiracy do not have to ... participate in every aspect of the conspiracy," but must knowingly embrace a common criminal objective. *United States v. Davis,* 838 F.2d 909, 913 (7th Cir.1988). The evidence showed that Judge Hogan steered cases to Harlan Becker and to Martin Schachter, a known member of the Hustlers' Club, in the same

fashion. Harlan Becker's bond totals in Judge Hogan's courtroom, which indicate the number of paying clients he represented, were inordinately high, corroborating Schachter's testimony that he saw Judge Hogan steer cases to Harlan Becker. Also incriminating were the comments made by Harlan Becker in the tape recordings themselves. Becker insinuated that he was paying judges and could act as a conduit for Terry Hake in making payments to Judge Hogan. His comments, in addition to evidence that he was receiving an extraordinary amount of business from Judge Hogan, indicate that Harlan Becker and Hogan were members of the same conspiracy.[8]

Unlike Hogan who prefers to categorize hustling, steering, and fixing cases into different conspiracies, we find that these activities were all aspects of the same conspiracy. That conspiracy, detailed in the indictment, was a conspiracy to accept payment in exchange for unlawful forms of favoritism in the First Municipal courtrooms. Evidence that Judge Hogan steered cases to Harlan Becker implies that Becker and Judge Hogan had this as their mutual objective and Becker's recorded comments to Terry Hake confirm that this was their goal. Therefore we find that the district judge did not err in finding Becker and Hogan to be members of the same conspiracy.

### C. Severance of the Tax Counts

Hogan directs his next challenge to the charges of filing false tax returns listed in Counts 7, 8, and 9. He argues that the district court should have severed the tax charges from the RICO charges. Hogan contends that the government's tax experts, using an indirect method of proof called the cash method, established that he owed approximately $20,000 in taxes for tax years 1981, 1982, and 1983. In comparison, he notes that the government established through direct evidence that he took

---

**8.** We need not consider whether the government could have shown a conspiracy between Becker and Hogan solely by introducing the out-of-court conversations. *See United States v. Silverman,* 861 F.2d 571, 577 (9th Cir.1988).

The government provided corroborative testimony from Martin Schachter and documented proof that Becker had high bond totals. Becker's statements to Terry Hake were not the only evidence of the conspiracy.

at most $4,400 in bribes during those years. Because these totals do not correlate, he contends that the district court should have granted his motion to sever the tax counts from the RICO counts.

Although Hogan does not indicate which rule of law he believes pertinent, the government assumes that Hogan is raising the issue of severance pursuant to Rule 14 of the Federal Rules of Criminal Procedure.[9] We therefore consider the issue of severance under Rule 14 because Hogan does not contradict the government's characterization. *Cf. West Allis Memorial Hosp., Inc. v. Bowen*, 852 F.2d 251, 257 (7th Cir.1988) (appellant has duty of presenting authority for its contentions).

Pursuant to Rule 14 of the Federal Rules of Criminal Procedure, the district court may order separate trials on individual counts if it appears that a defendant is prejudiced by joinder of the offenses. We will reverse the district court's decision to deny or grant a motion for severance under Rule 14 only for an abuse of discretion. *United States v. Turk*, 870 F.2d 1304, 1306 (7th Cir.1989). To establish an abuse of discretion, the defendant must show that he suffered actual prejudice. *United States v. L'Allier*, 838 F.2d 234, 241 (7th Cir.1988). In determining whether joinder caused the defendant actual prejudice, we determine whether evidence supporting one count could also have been admitted in a trial solely on the other count. *See, e.g., id.* at 241. If the evidence would have been admissible on either count, the defendant cannot claim that he was prejudiced by joinder. We also consider whether the district judge gave limiting instructions with regard to the evidence and the counts. *See, e.g., United States v. Oakey*, 853 F.2d 551, 555 (7th Cir.1988); *L'Allier*, 838 F.2d at 242.

The government claims that evidence that Hogan took bribes and engaged in a bribery conspiracy would have been admissible in a tax trial to show that Hogan received actual income that he did not report. With this we agree. *See, e.g., United States v. Palmer*, 809 F.2d 1504, 1505 (11th Cir.1987); *United States v. Abodeely*, 801 F.2d 1020, 1025 (8th Cir.1986); *United States v. Rothstein*, 530 F.2d 1275, 1279–80 (5th Cir.1976). It was entirely appropriate for the government to submit both direct and indirect proof of Hogan's tax liability. Through the direct proof that Hogan took bribes that were not listed on his tax returns, the government established the falsity of his returns.

Whether evidence that Hogan had $20,000 in unreported income would have been admissible in a trial based solely on the bribery charges is, however, a closer call. A large amount of unreported income is not the same as a great deal of cash on hand. Proof that a defendant failed to report income is prejudicial in a bribery case because it involves illegal activity. The government offers several reasons why the evidence of a $20,000 tax deficiency would nevertheless have been admissible. According to the government, the evidence demonstrates that Hogan had a large amount of cash during the time he allegedly took bribes. The government also argues that the evidence indicates that Hogan knew that taking money from attorneys was illegal because he neglected to report the money he received on his tax returns. Finally, the government says that the tax discrepancy corroborates the testimony of witnesses who stated that they paid Judge Hogan bribes.

A district judge, evaluating whether to admit in a bribery trial evidence that a defendant failed to report $20,000 of taxable income, would need to consider Rules 403 and 404 of the Federal Rules of Evi-

---

9. Rule 8 of the Federal Rules of Criminal Procedure also applies to questions of joinder but governs only allegations in the indictment. Once the indictment is found to meet the criteria for joinder in Rule 8, all further issues of joinder are controlled by Rule 14. *See United States v. Garner*, 837 F.2d 1404, 1412 (7th Cir. 1987), *cert. denied*, — U.S. —, 108 S.Ct. 2022,

100 L.Ed.2d 608, — U.S. —, 108 S.Ct. 2914, 101 L.Ed.2d 945, — U.S. —, 109 S.Ct. 244, 102 L.Ed.2d 232 (1988); *see also United States v. Lane*, 474 U.S. 438, 447, 106 S.Ct. 725, 731, 88 L.Ed.2d 814 (1986). Hogan does not claim that the indictment was defective, therefore Rule 14 appears appropriate.

dence. Rule 403 permits the trial court to exclude relevant evidence if its probative value is outweighed by the danger of unfair prejudice. Rule 404 states that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith" but may be "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b). In analyzing the admissibility of evidence under Rules 403 and 404(b) a trial judge would first consider whether the evidence was directed toward establishing a matter in issue other than the defendant's propensity to commit the offense. *United States v. Shackleford*, 738 F.2d 776 (7th Cir.1984). The district court would also evaluate whether the other act was similar enough and close enough in time to the offense charged, *id.* at 779, and whether the act occurred and the defendant was the actor, *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). Finally, the court would weigh the probative value of admitting the evidence against the danger of unfair prejudice. *Shackleford*, 738 F.2d at 779.

Although the tax evidence is prejudicial in the bribery context, we cannot say that the prejudice so outweighs its relevance that a district court would have abused its discretion by admitting the evidence. The government revealed Hogan's tax deficiency only for the years in which he also was accused of taking bribes.[10] The evidence established that Hogan had unreported income on hand during 1981, 1982, and 1983. We have previously held that evidence of wealth may be admissible to establish that a person engaged in a cash-intensive criminal enterprise, even if there is another explanation for the extra money. *See United States v. Bowie*, 515 F.2d 3, 9 (7th Cir. 1975); *United States v. Higgans*, 507 F.2d 808, 813 (7th Cir.1974); *see also United*

States v. Magnano, 543 F.2d 431, 437 (2d Cir.1976), *cert. denied*, 429 U.S. 1091, 97 S.Ct. 1101, 51 L.Ed.2d 536 (1977); *United States v. Tramunti*, 513 F.2d 1087, 1105 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *cf. United States v. Davis*, 838 F.2d 909, 921 (7th Cir.1988) (court holds harmless error to admit large quantities of cash to show defendants were involved in large-scale drug conspiracy). Evidence that the money came from another source goes to the weight and not the admissibility of the evidence. *See Davis*, 838 F.2d at 921. Furthermore, evidence that Hogan did not report the money he received from attorneys suggests that he knew that the payments were unlawful. Potentially prejudicial evidence, intended to show a defendant's knowledge, is specifically admissible under Rule 404(b). The evidence of $20,000 of undeclared income would arguably have been admissible in a trial for bribery. We believe that the district court in these circumstances did not abuse its discretion by refusing to sever the tax and RICO counts.

■ Even if the district court had abused its discretion in joining the RICO and tax counts, joinder of a tax claim to another charge, when the underlying charge generated only a portion of the unreported income, does not require automatic reversal. *See United States v. Anderson*, 809 F.2d 1281, 1288–89 (7th Cir. 1987). The government sought to prove both directly and indirectly that Hogan took bribes that were not reported as income on his tax returns. The jury found Hogan guilty of accepting bribes. As the district court instructed, this direct proof alone established that Hogan falsified his tax returns. Likewise, the evidence that Hogan took bribes was compelling; the tax evidence did little more than substantiate the testimony of numerous witnesses who stated that they paid Judge Hogan money for favorable treatment.[11]

---

10. The government used tax returns from prior years to impeach Hogan on cross-examination. Hogan, however, does not challenge the admission of those returns for the limited purposes of impeachment.

11. Contrary to Hogan's contention, this case is distinguishable from *United States v. Halper*, 590 F.2d 422 (2d Cir.1978). In *Halper*, the Second Circuit held that the district court should have severed medicaid fraud charges from a tax

The district court provided additional safeguards by instructing the jury to consider each count separately. *See United States v. Berardi,* 675 F.2d 894, 901 (7th Cir.1982). The court explained the method that the government had used to devise its tax figures and noted that the government had used both direct and indirect methods of proving tax liability. Defense counsel extensively cross-examined the government's tax experts and pointed out the inconsistency between the government's evidence of tax liability using the cash method analysis and the evidence that Judge Hogan took bribes. The jury could then weigh the reliability of the evidence. Because the court adequately instructed the jury and defense counsel thoroughly explored the discrepancies in the evidence, we are satisfied that joinder of the RICO and tax counts did not prejudice Hogan.

### D. *"Cash Method" Proof of Undeclared Income*

In addition to raising the severance issue, Hogan challenges the admissibility of testimony regarding the cash method. He attacks four aspects of the tax testimony. According to Hogan, the cash method is not reliable because the amount of money taken as bribes ($4,400) does not correlate to the amount of unreported income ($20,000) established through the cash method. He also asserts that the cash method is an unapproved method for establishing tax liability; that the government failed to clarify the amount of money with which Hogan began 1981, a necessary prerequisite to using an indirect method of proof; and that the government failed to include Rae Hogan, Hogan's wife, as a source of cash in its analysis. We commit issues concerning the admissibility of evidence to the sound discretion of the trial court. *United States v. Rein,* 848 F.2d 777, 781–82 (7th Cir.1988). Unless the appellant can show that the court abused its discretion, we will not reverse its decision. *Id.* With that in

mind, we consider each of Hogan's arguments.

#### 1. Lack of Correlation

■ We can easily dispose of Hogan's first contention. As we acknowledged earlier, evidence that the defendant had more unreported income than proven directly through evidence supporting the underlying substantive charge is not inadmissible as a matter of law. *Cf. Anderson,* 809 F.2d at 1288–89. The inconsistency between the cash method figures and the amount that witnesses testified was given in bribes is a matter appropriate for argument, affecting the weight but not the admissibility of the evidence. The jury heard the evidence and defense counsel extensively cross-examined the tax experts regarding the flaws and inconsistencies in the cash method. Defense counsel also emphasized in its closing argument the inconsistency in the evidence. The court advised the jury that it was the jury's duty to evaluate the credibility of the witnesses, including the tax experts. The jury, therefore, was free to reject the government's cash method based on the lack of correlation between the government's figures. Because of these safeguards, we reject Hogan's argument that the discrepancies in the evidence render the cash method wholly unreliable and inadmissible.

#### 2. Unapproved Method of Proof

■ Hogan next challenges the cash method as an untested and "unapproved circumstantial method of proof." Unlike other methods of proof upheld by the courts, Hogan contends, the cash method fails to account for all of the taxpayer's assets. Used correctly, however, the cash method should account for all of the taxpayer's known sources and uses for cash. It is a variation on the "cash expenditures" method, which we and other courts have upheld as a reliable method for indirectly proving unreported income. *See United States v. Marrinson,* 832 F.2d 1465 (7th

---

evasion count. The prosecution in *Halper* provided no proof that the defendant excluded profits from the medicaid fraud from his tax returns. *Id.* at 429. Unlike the prosecution in

*Halper,* the government showed that Hogan did not report income he received from attorneys as bribes on his tax returns. The charges were therefore related.

Cir.1987); *United States v. Caswell*, 825 F.2d 1228 (8th Cir.1987); *United States v. Abodeely*, 801 F.2d 1020 (8th Cir.1986); *Taglianetti v. United States*, 398 F.2d 558 (1st Cir.1968), *aff'd*, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969). The cash expenditures method determines the amount of unreported income by "establishing the amount of [defendant's] purchases and services which are not attributable to the resources at hand at the beginning of the year or to non-taxable receipts during the year." *Taglianetti*, 398 F.2d at 562. If the amount of purchases and services exceeds defendant's reported income, resources on hand, and nontaxable receipts, the jury may infer that the defendant underreported income.

Like the cash expenditures method, the cash method focuses on the taxpayer's sources and uses of income. Unlike the cash expenditures method, however, the tax expert considers only coin and currency when using the cash method, ignoring assets and purchases that do not generate cash.[12] The tax expert need not establish the taxpayer's opening and closing net worth except when that net worth contains assets that have been converted into sources for cash. *Cf. Marrinson*, 832 F.2d at 1469. Sources for cash include cash returned on deposits, checks written to "cash," cash withdrawn from checking and savings accounts, cash contents of safe deposit boxes, in addition to money on hand at the beginning of the taxable year. The expert then adds cash received from nontaxable sources of income—including loans, advances from credit cards, gifts, and inheritances—to cash generated by sources and compares this total to the amount of purchases and services for which the taxpayer paid cash. If the cash expenditures exceed the sources, the tax expert infers that the taxpayer failed to report income.

Apparently no other court has assessed the reliability of the cash method for identifying whether a taxpayer has failed to report taxable income. We, however, hold that under appropriate circumstances the cash method is an admissible method of proof if the government satisfies criteria similar to those used to evaluate the traditional cash expenditures method. Hogan reported on his returns that he only received taxable income from his judicial salary and from interest payments. Hogan deposited this income in bank accounts. Because Hogan had limited known sources of income and deposited the income from those sources in a bank account where noncash uses could be traced, the circumstances are particularly appropriate for the government to use a cash method of proof. Purchases made by means other than cash, such as payments made by check or credit card, can easily be traced and eliminated from the analysis, leaving only cash purchases to be analyzed through the indirect cash method. Where the defendant does not rely on noncash sources of income and channels money through a banking institution, the cash method is a particularly appropriate method for analyzing unreported income.

In a cash expenditures case, the government must show with "reasonable certainty" (1) defendant's opening net worth and cash on hand at the beginning of the period for which he was indicted and (2) defendant's expenditures during the period in question. *Caswell*, 825 F.2d at 1232. The government must also demonstrate a likely source of the allegedly unreported income or negate all reasonably possible nontaxable sources of income. *Id.* at 1231. To negate nontaxable sources of income, the government must investigate all reasonable leads. Using these criteria for guidelines, we address Hogan's remaining contentions.

### 3. Failure to Identify Cash on Hand

■ To establish a taxpayer's opening net worth in a cash expenditures case, the government is not required to present a formal net worth statement but to reasonably assess income and resources in the

---

**12.** Although the term "cash" is often intended to include purchases made with checks, the cash method, as defined by the government, does not include checks as a type of cash. Therefore, when we use the term "cash" we are only referring to coin and currency.

opening year. *Marrinson,* 832 F.2d at 1470. Although formal proof of net worth is not required, one court has stated that it is "essential" to establish cash on hand. *United States v. Citron,* 783 F.2d 307, 316 (2d Cir.1986). If a defendant volunteers a cash source for the allegedly unreported income, the government must show that it investigated the taxpayer's claim. *See id.* at 316. In a cash method case, therefore, the government must reasonably assess the cash on hand and sources of cash available at the beginning of the first year for which defendant is prosecuted. Hogan identifies the government's failure to establish his financial starting point as his third criticism of the cash method.

The government, however, adequately established that Hogan had no cash on hand at the beginning of 1981. An IRS agent testified that he investigated possible cash sources of income for Hogan and discovered no gifts, inheritances, or other nontaxable income in 1980. He also testified that Hogan appeared to take cash out of his account only as needed in 1980 and that Hogan had outstanding car and boat loans and credit card debts at the beginning of 1981. According to the agent, Hogan was paying interest on several loans and accounts at that time. Hogan admitted on cross-examination that he often received late payment notices from credit card companies and that one credit card company had placed his account in the hands of its collection department. Given this testimony, the jury could have found with reasonable certainty that Hogan did not have any cash on hand at the beginning of 1981. As stated in *United States v. Marrinson,* "it is possible to arrive at the conclusion that a taxpayer had no cash on hand, using the source and application of funds analysis, by demonstrating that a taxpayer simply spent more than he otherwise had available to him during that time." 832 F.2d at 1470.

4. Failure to Consider All Sources of Cash

■ Hogan also claims that the government failed to consider all of his cash sources in determining his cash income for 1981, 1982, and 1983. Specifically, he complains that the government did not consider his wife as a source of cash. As we stated earlier, the government is obligated to investigate all reasonable leads volunteered by the defendant and conduct a reasonable search for other cash sources to ensure that its analysis is thorough. *Holland v. United States,* 348 U.S. 121, 135–36, 75 S.Ct. 127, 135–36, 99 L.Ed. 150 (1954).

The government's tax expert testified that he considered all known sources of cash income in analyzing Hogan's tax records. The government provided testimony that it had reviewed the federal and state tax returns of Hogan and his wife, Hogan's salary checks, records from the judges' retirement system, Hogan and his wife Rae's banking records, loan and investment documents, Hogan's economic statement of interest, third-party checks, credit card records, travel documents, and Illinois Department of Conservation records. The government also subpoenaed institutions and persons to whom Hogan wrote checks and produced witnesses who testified regarding Hogan's purchases. Furthermore, the government interviewed Hogan's relatives and friends to determine whether the Hogans had nontaxable sources of cash. From this evidence a jury could infer that the government conducted a reasonable investigation to uncover all known sources of cash.

Although Hogan argues that the government should have included Rae Hogan as a source of cash, the government provided evidence concerning the effect her income would have on the unreported income figures presented and explained why it believed the jury should not consider her income in the analysis. The government developed a "Joint Cash Schedule" that showed the combined taxable income and unreported income of Hogan and his wife, in addition to the schedule analyzing only Hogan's cash income. The government's tax expert described each chart to the jury. The tax expert then explained that, based on Rae Hogan's cash expenditure pattern, her substantially smaller income, and the couple's bill payment practices, he did not

consider Rae Hogan a source of income for her husband. Defense counsel thoroughly cross-examined the tax expert regarding his opinion that Rae Hogan was not a source of cash for Hogan and again emphasized this point in closing argument.

Hogan contends that cross-examination cannot rectify the damage caused by the omission of Rae Hogan's income from the government's primary analysis. In *United States v. Citron*, 783 F.2d 307, 316 (2d Cir.1986), the Second Circuit reversed a conviction for income tax evasion because the prosecution failed to lay a proper foundation for a chart that summarized the defendant's opening net worth. The Second Circuit rejected the argument that cross-examination could correct the error because the jury could not determine how the government derived the figures. *See id.* at 317. Unlike the prosecution in *Citron*, however, the government's tax expert explained the entries on the charts submitted, including the Joint Cash Schedule. The government identified why it thought the chart illustrating only Hogan's income was more accurate. The distinctions between the joint income chart and Hogan's chart were not complicated. The jury needed no special expertise to understand the government's presentation. We therefore find that cross-examination sufficiently exposed the alleged flaws in the government's dual presentation and that the district court did not abuse its discretion by admitting evidence of Hogan's tax liability exclusive of Rae Hogan's income.

### E. Hearsay Testimony of Tim Smith

Finally, Hogan contends that the district court erred in excluding certain testimony of Tim Smith, the son of the deceased Tempel Smith, Sr. who was a millionaire industrialist and Hogan's friend. In a proffer outside the jury's presence, Tim Smith testified that he overheard the following conversation during the summer or fall of 1979: his father told Tim's cousin that he wanted to give Hogan some money; Tim's cousin replied that Tempel Smith, Sr. could not give Hogan money because Hogan was a judge; Tempel Smith, Sr. responded that he could give Hogan money if it was a gift and not payment for services.

The district court excluded this testimony as hearsay, but Hogan argues that it is admissible under the state of mind exception, Rule 803(3) of the Federal Rules of Evidence. He contends that the testimony was offered to show Tempel Smith, Sr.'s desire to give him a gift or to prove that Tempel Smith, Sr. actually gave a gift of $5,000 to him in September 1979. An out-of-court statement is inadmissible hearsay if offered "to prove the truth of the matter asserted." Fed.R.Evid. 801. There is little question that the testimony offered by Hogan was hearsay because Hogan offered the testimony to ultimately prove that Tempel Smith, Sr. gave him cash as a gift.

Rule 803(3), however, excepts from the hearsay rule "statement[s] of the declarant's then existing state of mind, ... (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed." Fed.R.Evid. 803(3). Hogan contends that the testimony is admissible under the rule of *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892), preserved in the advisory committee notes to Rule 803(3). In *Hillmon* the Supreme Court held that statements of a declarant's future intent are admissible to show that the declarant acted in conformity with his intention. *Id.* at 295, 12 S.Ct. at 912; *see United States v. Peak*, 856 F.2d 825, 833 (7th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 499, 102 L.Ed.2d 535 (1988).

The district court held that the testimony regarding the overheard conversation was inadmissible because it failed to show that Tempel Smith, Sr. specifically intended to give Hogan a cash gift in September 1979. We agree with the district court that Tempel Smith, Sr.'s comments were too speculative and vague to infer that he would immediately offer money to Hogan. As the Supreme Court stated in *Hillmon*:

> When the intention to be proved is important only as qualifying an act, its connection with that act must be shown, in order to warrant the admission of decla-

rations of the intention. But whenever the intention is of itself a distinct and material fact in a chain of circumstances, it may be proved by contemporaneous oral or written declarations of the party.

The existence of a particular intention in a certain person at a certain time being a material fact to be proved, evidence that he expressed that intention at that time is as direct evidence of the fact, as his own testimony that he then had that intention would be.

145 U.S. at 295, 12 S.Ct. at 912. As *Hillmon* and subsequent case law indicate, these statements derive reliability and probative value from their nexus to the act itself. *See, e.g., United States v. DiMaria,* 727 F.2d 265, 271 (2d Cir.1984) (statement admissible because it conveyed immediate state of mind); *United States v. Williams,* 704 F.2d 315, 321–22 (6th Cir.) (no abuse of discretion to exclude statements of intent that depended on the fulfillment of conditions subsequent), *cert. denied,* 464 U.S. 991, 104 S.Ct. 481, 78 L.Ed.2d 679 (1983). To identify that nexus, courts will consider the contemporaneous nature of the statements and the act, the chance for later reflection, and the relevance of the statements. *See United States v. Ponticelli,* 622 F.2d 985, 991 (9th Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 578, 66 L.Ed.2d 476 (1980). The contemporaneous nature of the statements and the act preclude problems of perception and memory. *See Oberman v. Dun & Bradstreet, Inc.,* 507 F.2d 349, 352 (7th Cir.1974).

Tempel Smith, Sr.'s comments to his nephew did not contain these indicia of reliability. It was unclear from his comments whether he actually intended to give Hogan cash or was merely considering the possibility. He did not indicate when he intended to give Hogan the money, and in fact, his comments suggest his uncertainty as to whether such a gift would be proper. This speculation indicates that, given a chance to reflect on the matter, Tempel Smith, Sr. may have reconsidered his proposal. Likewise, Tim Smith testified that he thought the conversation occurred in the summer or fall of 1979 but could not specify the month or the amount of money that his father was considering as a gift. The comments themselves and the surrounding circumstances simply do not indicate to us that the statements were a reliable indication of Tempel Smith, Sr.'s state of mind at the time that Hogan testified that Tempel Smith, Sr. actually gave him the money.

Even if the district court had erred in excluding Tempel Smith, Sr.'s comments, we would reverse a criminal conviction for an erroneous evidentiary ruling only if the ruling affected a defendant's substantial rights. *See Peak,* 856 F.2d at 834; *see also* Fed.R.Crim.P. 52(a); Fed.R.Evid. 103(a). We will reverse if the error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986) (quoting *United States v. Kotteakos,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *see also Peak,* 856 F.2d at 834. When the erroneous exclusion of evidence precludes or impairs the presentation of a defendant's sole means of defense, we deem the exclusion to have had a substantial and injurious effect on the jury. *Peak,* 856 F.2d at 834–35.

The exclusion of Tim Smith's testimony regarding the overheard conversation did not affect substantial rights. Hogan offered Tim Smith's testimony regarding his father's conversation to refute the government's cash method proof that Hogan had approximately $20,000 in unreported income. The government did not, however, rely solely on this indirect method of proof to establish that Hogan lied on his income tax returns. The government provided direct proof that Hogan took bribes that were excluded from his tax returns. The jury found Hogan guilty of taking bribes. This evidence alone established Hogan's tax deficiency and the cash method evidence was supplementary. Therefore any attack on the cash method evidence had only a mild impact on the overall case against Hogan regarding the tax charges.

## III. CONCLUSION

We find that the evidence was sufficient to support a conviction for aiding and abet-

ting a bribe and that the district court properly admitted tape-recorded conversations between Terry Hake and Harlan Becker. We also believe that the district court committed no error on the issues of severance and the admissibility of the cash method evidence. Nor do we find merit in the argument that Tempel Smith, Sr.'s conversation with his nephew was admissible. For these reasons, we AFFIRM.

A true Copy: