T.C. Memo. 1999-171


UNITED STATES TAX COURT


STEVEN H. TOUSHIN, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 21724-92.                    Filed May 20, 1999.


Angelo Ruggiero and Michael R. Esposito, for petitioner.

Luanne S. DiMauro and Donna C. Hansberry, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, Judge:  Respondent determined the following deficiencies in and additions to petitioner's Federal income taxes:

| | | Additions to Tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(b) | Sec. 6653(b)(2) | Sec. 6661 |
| 1980 | $25,265 | $16,983 | $0 | $0 |
| 1981 | 34,220 | 25,018 | 0 | 0 |
| 1982 | 21,196 | 10,598 | [1] | 5,299 |

[1] 50 percent of the statutory interest on $21,196.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for decision are: (1) Whether petitioner had unreported income in 1980, 1981, and 1982; (2) whether petitioner is liable for the additions to tax for fraud for 1980, 1981, and 1982; (3) whether petitioner is liable for an addition to tax for a substantial understatement for 1982; and (4) whether respondent is barred by the statute of limitations from assessing the deficiencies and additions to tax for 1980, 1981, and 1982.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, and the attached exhibits are incorporated herein by this reference. At the time the petition was filed, petitioner resided in Chicago, Illinois.

Petitioner's Business Interests Prior to May 1978

During the early 1970's, petitioner was a partner in the Festival Theater Partnership (Festival Partnership), which owned a three-story building located at 1349 N. Wells Street in Chicago, Illinois. During that time, petitioner was also a shareholder in the Festival Theater Corp. (Festival Corp.), which owned and operated the Bijou Theater (the Bijou), a movie theater

located in the first story of the building located at 1349 N. Wells Street.

As a result of a dispute among the partners, the assets of the Festival Partnership were placed into receivership in 1976. The assets of the Festival Corp. were eventually added to the receivership. On March 24, 1978, the receiver turned over the Bijou and the building in which it was operated to petitioner.

Petitioner's Poor Financial Condition During Receivership

During the receivership years (1976-1978), petitioner had serious financial problems. Petitioner borrowed from numerous relatives, was frequently overdrawn on his personal checking account, made minimum payments on his credit card balances, and took a job performing menial tasks at his in-law's business.

Petitioner's Business Interests as of May 1978

From May 1978 through December 1982, Entertainment & Amusement, Inc., a corporation incorporated in the State of Illinois (E&A of IL), operated the Bijou. Petitioner was the president of E&A of IL at all times and was the sole shareholder of E&A of IL until 1981. In 1982, petitioner was at least a 50-percent shareholder of E&A of IL.

On October 1, 1981, Entertainment and Amusement, Inc., was incorporated in the State of California (E&A of CA). Petitioner was the sole shareholder and president of E&A of CA. E&A of CA

operated the Screening Room, a movie theater located in San Francisco, California, similar to the Bijou.

Cash Receipts at the Bijou and the Screening Room

The Bijou and the Screening Room were predominantly cash businesses. At both the Bijou and the Screening Room, there were established procedures for dealing with the daily cash receipts.

At the Bijou, employees collected admission fees from patrons, issued numbered tickets, and allowed patrons to pass through a turnstile equipped with a counting device. The employees would reconcile the tickets and turnstile numbers on an hourly basis to ensure the correct amount of money had been collected. After collecting $100 in admission fees, the Bijou employees would put the $100 in an envelope (drop envelope), mark the envelope sequentially, and drop it in a safe. Similar drops were made for cash receipts from video and other sales.

The Bijou employees recorded their daily receipts from ticket, video, and other sales on daily sheets (sometimes called shift or drop sheets). Daily sheets contained the date, the shift, the admission tickets and turnstile numbers (for admission fees receipts), and each $100 drop into the safe.

Petitioner was the sole person with access to the Bijou's drop safe. On a daily basis, petitioner removed the drop envelopes and the daily sheets from the safe and placed them into a duffle (shoulder) bag.

After filling the duffle bag, petitioner left to reconcile the drop envelopes and the daily sheets. After reconciling these amounts, petitioner destroyed these documents.

From the daily sheets and the drop envelopes, petitioner created "daily report sheets" and made ledger entries summarizing the Bijou's monthly cash receipts. Petitioner's accountant used the ledger to prepare the Bijou's income tax return. Petitioner did not include all of the Bijou's cash receipts in the daily report sheets or ledger.

Petitioner generally made the daily deposit for the Bijou. Petitioner did not deposit all of the Bijou's cash receipts into the corporate bank account. At times, petitioner deposited only one-half of the day's receipts.

On a few occasions when petitioner was on vacation, Walter Killeen, the unofficial manager of the Bijou from 1979 until 1981, collected the drop envelopes and deposited the Bijou's receipts. Petitioner instructed Killeen to use deposit slips previously prepared by petitioner and to deposit only up to the amount already listed on the deposit slip for any particular date. Petitioner instructed Killeen to put the rest of the receipts aside for petitioner.

The Screening Room operated in a similar fashion to the Bijou. Petitioner was not present on a daily basis at the Screening Room, so Killeen, who became the Screening Room's

manager upon its opening in 1981, collected the daily drop envelopes and daily sheets. Killeen deposited all of the Screening Room's daily receipts. Killeen kept some records pertaining to the Screening Room despite petitioner's instructions not to keep records and to destroy any previously created records.

Internal Revenue Service's (IRS) Criminal Investigation of Petitioner

During 1982, the IRS began a criminal investigation of petitioner. Petitioner instructed Killeen to avoid the IRS.

Petitioner coached Killeen on how to answer questions from the IRS. Additionally, when Killeen became nervous about the IRS's investigation, petitioner sent Killeen on vacation to Long Beach, California, for about 2 months.

Petitioner's Cash Dealings

Petitioner dealt in cash. Petitioner paid many of his personal expenses with cash.

On occasion, petitioner used cash from the Bijou's drop envelopes to pay his personal expenses. These expenses included a downpayment of at least $23,000 on a condominium located at 3530 North Lake Shore Drive in Chicago (the 3530 condo) and the babysitter's weekly salary.

Petitioner's Cash Sources and Uses

Petitioner had the following cash sources in 1981 and 1982:[1]

|                                                              | 1981     | 1982     |
| ------------------------------------------------------------ | -------- | -------- |
| Loans from E&A of IL                                         | $0       | $11,110  |
| Withdrawal from petitioner's personal savings account #143263-2 | 5,221    |          |
| Cash back on deposits                                        | 600      |          |
| Paychecks cashed                                             | 1,151    |          |
| Checks cashed conceded by respondent                         | 936      | 178      |
| Capital gains                                                | 26,500   | 40,350   |
| Cash received from money orders                              | 5,756    | 3,843    |
| Rental income                                                |          | 2,500    |
| Total cash sources                                           | $40,164  | $57,981  |

Petitioner had the following cash uses in 1981 and 1982:

|                                                                             | 1981    | 1982    |
| --------------------------------------------------------------------------- | ------- | ------- |
| Cash deposited into petitioner's personal checking account #501-344         | $6,551  | $3,260  |
| Cash deposited into Walter Killeen Co. checking account #332-232            | 23,129  | 2,100   |

---

[1] For convenience, all numbers are rounded to the nearest dollar.

| | | |
|---|---|---|
| Cash deposited into<br>  Anthony J. Medina, Jr. Co.<br>  account #541-834 | 100 | 12,285 |
| Sheila Buralli, babysitter | 3,000 | |
| Mercedes Benz | 18,015 | |
| Ultimo, clothing store | 1,100 | |
| Parking space rental | 156 | 156 |
| Sylvia Dawson, housekeeper | 2,400 | |
| Tiffany's | 742 | 1,559 |
| Personal money orders | 28,697 | 82,478 |
| Gold Coast Travel Corp. | 1,165 | |
| Susan Toushin's "walking<br>  around" money | 12,000 | |
|     Total cash uses | $97,055 | $101,838 |

## Petitioner's Plea Agreement

On August 8, 1991, petitioner pleaded guilty to filing a false income tax return for 1980 in violation of section 7206(1). In his plea agreement, petitioner admitted to skimming cash proceeds from E&A of IL through his operation of the Bijou. Petitioner admitted his unreported skimmed cash income totaled $59,411 for 1980.

### OPINION

## I. Unreported Income

The first issue presented is whether petitioner had unreported income for 1980, 1981, and 1982. Petitioner bears the

burden of proof as to any underlying deficiency.  See Rule 142(a).

A.  Respondent's Indirect Method of Proof

When a taxpayer fails to keep sufficient records to enable respondent to determine his correct tax liability, respondent may compute the taxpayer's income by any method that clearly reflects income.  See secs. 446(b), 6001; Sutherland v. Commissioner, 32 T.C. 862 (1959).

Respondent used the cash method to indirectly prove that petitioner had unreported income for the years in issue.  The Court of Appeals for the Seventh Circuit has held that the cash method is an acceptable method for calculating a taxpayer's unreported income.  See United States v. Hogan, 886 F.2d 1497, 1509 (7th Cir. 1989).  In United States v. Hogan, supra at 1508-1509, the Court of Appeals stated:

> [The cash method] is a variation on the "cash expenditures" method * * *.  The cash expenditures method determines the amount of unreported income by "establishing the amount of [defendant's] purchases and services which are not attributable to the resources at hand at the beginning of the year or to non-taxable receipts during the year."  If the amount of purchases and services exceeds defendant's reported income, resources on hand, and nontaxable receipts, the jury may infer that the defendant underreported income.
>
> Like the cash expenditures method, the cash method focuses on the taxpayer's sources and uses of income.  Unlike the cash expenditures method, however, the tax expert considers only coin and currency when using the cash method, ignoring assets and purchases that do not generate cash.[12]  * * *  Sources for cash include cash

returned on deposits, checks written to "cash," * * *, cash contents of safe deposit boxes, in addition to money on hand at the beginning of the taxable year. The expert then adds cash received from nontaxable sources of income--including loans, advances from credit cards, gifts, and inheritances--to cash generated by sources and compares this total to the amount of purchases and services for which the taxpayer paid cash. If the cash expenditures exceed the sources, the tax expert infers that the taxpayer failed to report income. [Citations omitted.]

[12] Although the term "cash" is often intended to include purchases made with checks, the cash method, as defined by the government, does not include checks as a type of cash. * * *

See also 1 Fink, Tax Fraud, sec. 17.03[7], at 17-30 (1998).

Utilizing this method, respondent determined that petitioner had unreported income of $59,411, $57,656, and $43,857 in 1980, 1981, and 1982, respectively.

B. Petitioner's Cash On Hand as of January 1, 1980

Petitioner does not challenge respondent's authority to use the cash method. Rather, petitioner contends that respondent incorrectly used the cash method because respondent failed to account for petitioner's beginning cash on hand.

Respondent determined petitioner had no cash on hand as of January 1, 1980. Petitioner claims he had a cash hoard of at least $80,000 in his home safe as of that date.

Petitioner admitted in his guilty plea that he had unreported skimmed income from the Bijou in 1980 totaling $59,411. This figure was computed based on cash on hand of $0 as

of January 1, 1980.  By his plea, petitioner thus implicitly admitted that he had no cash hoard as of January 1, 1980. Additionally, there is ample evidence that petitioner experienced serious financial problems between 1976 and 1978 when his assets were in receivership.  Petitioner's allegation of a cash hoard was inconsistent, implausible, and not supported by objective evidence in the record.  See Parks v. Commissioner, 94 T.C. 654, 661 (1990).

We therefore conclude that petitioner did not have a cash hoard as of January 1, 1980.

C.  Petitioner's Sale of Poppers

Petitioner alternatively argues that his unreported income was attributable to his sale of "poppers"[2] on behalf of the Screening Room and that E&A of CA, and not petitioner, should be taxed on the income from the sale of poppers.

From petitioner's testimony, it is unclear how petitioner acquired the poppers, if and how petitioner transferred the poppers to the Screening Room, the quantity sold, and the price at which they were sold.  Petitioner's testimony was vague and contradictory as to this matter.  See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  Even if we were to believe that petitioner, acting as a representative of the Screening Room,

---

[2] "Poppers" consist of a substance which a person inhales "to get high".

sold poppers, we would not be able to conclude how much of the unreported income was attributable to these sales.

    D.  Petitioner's Unreported Income

Petitioner admitted in his plea agreement and we find that he had unreported income of $59,411 in 1980. As for 1981 and 1982, based upon the above findings, we conclude that petitioner had the following unreported income:

|  | 1981 | 1982 |
|---|---|---|
| Cash on hand at beginning of year | $0 | $0 |
| Add: cash sources | 40,164 | 57,981 |
| Cash available for year | $40,164 | $57,981 |
| Less: cash uses | (97,055) | (101,838) |
| Unreported income | $56,891 | $43,857 |

II.  Addition to Tax for Fraud

For 1980 and 1981, section 6653(b), and for 1982, section 6653(b)(1) provide for an addition to tax of 50 percent of the underpayment if any part of the underpayment of tax required to be shown on a return is due to fraud. Additionally, for 1982, section 6653(b)(2) provides for an addition to tax equal to 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment attributable to fraud. In this case, respondent alleges that the entire underpayments are due to fraud.

Respondent bears the burden of proof to show by clear and convincing evidence that (1) an underpayment exists, and (2) some part of the underpayment is due to fraud. See Rule 142(b). Where fraud is determined for each of several years, respondent's burden applies separately for each of the years. See Estate of Stein v. Commissioner, 25 T.C. 940, 959-963 (1956), affd. per curiam sub nom. Levine v. Commissioner, 250 F.2d 798 (2d Cir. 1958).

A.  Underpayment of Tax

Where the allegations of fraud are intertwined with unreported and indirectly reconstructed income, respondent may prove an underpayment either (1) by proving a likely source of the unreported income or (2) where the taxpayer alleges a nontaxable source, by disproving the nontaxable source so alleged. See Parks v. Commissioner, supra.

Respondent contends that petitioner's unreported income in the years in issue was the result of petitioner's skimming from the Bijou's cash receipts, and such skimmed receipts constitute constructive dividends which are taxable to petitioner.

Respondent carefully reconstructed the procedures used at the Bijou for dealing with its daily cash receipts in 1980, 1981, and 1982 and petitioner's unfettered access to those receipts. Petitioner was the sole person with access to the drop safe at the Bijou. Petitioner collected the drop envelopes from the

safe. Petitioner deposited the Bijou's cash receipts; however, petitioner sometimes deposited only one-half of those cash receipts.

Petitioner routinely was seen making personal purchases with large sums of cash. Petitioner was even seen making some personal purchases with cash removed from a duffle bag in envelopes resembling the drop envelopes used by the Bijou. Petitioner also routinely sent large sums of cash and money orders to the Screening Room in order to pay that business's weekly expenses. Before its remodeling in 1982, the Screening Room did not generate enough income to cover its expenses.

Furthermore, in his plea agreement, petitioner admitted that his unreported income in 1980 was from skimmed cash receipts of the Bijou.

From the entire record, we conclude that petitioner routinely took cash from the Bijou's drop safe in 1980, 1981, and 1982 for his own personal use and to pay for the Screening Room's expenses.

Generally, where a shareholder diverts corporate funds to his own use, those funds constitute constructive dividends to him and are ordinary income to the extent of the corporation's earnings and profits. See secs. 301(c), 316; Truesdell v. Commissioner, 89 T.C. 1280, 1295 (1987).

Respondent has shown that E&A of IL had sufficient earnings and profits during the years in issue to account for all of petitioner's unreported income in those years.  Petitioner has presented no evidence to the contrary.

We conclude that respondent has established by clear and convincing evidence an underpayment of tax for 1980, 1981, and 1982.

B.  <u>Fraudulent Intent</u>

Respondent must also show that for each of the years in issue the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes.  See <u>Parks v. Commissioner</u>, 94 T.C. at 661; <u>Rowlee v. Commissioner</u>, 80 T.C. 1111, 1123 (1983).

Because direct proof of a taxpayer's intent is rarely available, fraud may be proven by circumstantial evidence and reasonable inferences may be drawn from relevant facts.  See <u>Spies v. United States</u>, 317 U.S. 492, 499 (1943).  Over the years, courts have developed a nonexclusive list of factors that demonstrate fraudulent intent.  These badges of fraud include: (1) Understating income, (2) maintaining inadequate records, (3) failing to cooperate with tax authorities, (4) an intent to mislead which may be inferred from a pattern of conduct, (5) filing false documents, (6) failing to file tax returns, and (7) dealing in cash.  See <u>id.</u>

The evidence establishes that petitioner consistently and substantially understated his income in 1980, 1981, and 1982. Petitioner maintained inadequate records for both of his businesses. Petitioner destroyed existing records at the Bijou and instructed Killeen to destroy any records kept at the Screening Room. Petitioner attempted to disrupt the IRS's criminal investigation by sending Killeen on vacation and counseling Killeen to lie to agents when questioned. Petitioner dealt extensively in cash both personally and in his businesses.

We also consider it significant that petitioner pleaded guilty to a violation of section 7206(1) for 1980. Although his plea does not, in and of itself, establish a fraudulent intent, we consider the crime as probative evidence that he intended to evade taxes, especially when combined with other factors taken from the record as a whole. See Wright v. Commissioner, 84 T.C. 636, 643-644 (1985); McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975).

We conclude that petitioner possessed the requisite fraudulent intent to evade taxes known to be owing for 1980, 1981, and 1982.

C. Conclusion

We find that respondent has clearly and convincingly proven that the entire underpayments of tax for 1980, 1981, and 1982 were due to fraud.

III.  Substantial Understatement of Income in 1982

Section 6661 imposes an addition to tax of 10 percent of the amount of any underpayment attributable to a substantial understatement of income tax.  A substantial understatement is one which exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  See sec. 6661(b)(1)(A).

If the taxpayer has substantial authority for the tax treatment of any item on the return, the understatement is reduced by the amount attributable to it.  See sec. 6661(b)(2)(B)(i).  Similarly, the amount of the understatement is reduced for any item adequately disclosed either on the taxpayer's return or in a statement attached to the return.  See sec. 6661(b)(2)(B)(ii).

Petitioner bears the burden of proving that the addition to tax under section 6661 does not apply.  See Rule 142(a); Tweeddale v. Commissioner, 92 T.C. 501, 506 (1989).  Petitioner has offered no evidence or argument that he is not liable for the addition to tax under section 6661(a).  We conclude that petitioner is liable for the section 6661(a) addition to tax for 1982.

IV.  Statute of Limitations

Where a fraudulent return is filed with the intent to evade tax, the tax may be assessed at any time.  See sec. 6501(c). Petitioner argues that respondent's assessment of deficiencies

and penalties for each of the years in issue is time barred because respondent failed to issue the notice of deficiency within the 3-year period prescribed by section 6501(a).

As we found herein, petitioner is liable for the additions to tax for fraud for 1980, 1981, and 1982; therefore, the period of limitations on assessment for those years remains open.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.