In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-1251

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WILLIAM PATRICK CLARK,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:11-cr-30236 — **David R. Herndon**, *Judge.*

ARGUED FEBRUARY 11, 2015 — DECIDED MAY 28, 2015

Before FLAUM, WILLIAMS, and HAMILTON, *Circuit Judges.*

FLAUM, *Circuit Judge.* William Patrick Clark's trucking business was hired to perform hauling services on a state- and federally funded highway project in Missouri. Because federal funds were in play, Clark's contract with the project's general contractor required that he pay his truck drivers the federal prevailing wage pursuant to the Davis-Bacon Act (which, at the time, was $35.45/hour). Clark chose not to do so, however, individually contracting with his drivers for

roughly $15/hour instead. Throughout the project, as required by his contract, Clark submitted weekly payroll certifications in which he falsely attested to paying his workers $35.45/hour. After his work on the project concluded, he submitted an affidavit to the Missouri Department of Transportation ("MODOT"), certifying compliance with Missouri state law and its state wage order. On account of these attestations, the government charged Clark with ten counts of making false statements in violation of 18 U.S.C. § 1001. Counts 1–9 pertained to nine of the weekly certifications he submitted, while Count 10 concerned the MODOT affidavit. A jury convicted Clark on each count.

On appeal, Clark argues that the government presented insufficient evidence for the jury to conclude that his false statements were *material* to the federal government—an element of § 1001. And he argues that the sentencing judge mistakenly concluded that his false statements *caused* his underpaid employees loss for purposes of applying the sentencing loss enhancement and ordering restitution. We disagree with Clark's argument regarding the materiality of the statements contained in his weekly payroll certifications and with his contention that those false statements had no effect on the monies paid to his employees. We agree with Clark, though, that the government failed to prove that his affidavit to MODOT had a natural capability of influencing the *federal* government. Accordingly, we reverse Clark's conviction on Count 10 due to insufficient proof of materiality. But we affirm his other nine convictions, the district court's order of restitution, and its application of the loss enhancement at sentencing.

## I. Background

William Patrick Clark, the owner and president of Clark Trucking and Excavation LLC ("Clark Trucking"), worked in his family's business from the time he was fourteen years old until the company dissolved as a consequence of his criminal convictions in this case. Clark was charged and convicted by a jury of making false statements (in violation of 18 U.S.C. § 1001(a)(3)) regarding the wages he paid to his employees on a subcontract to improve Interstate Highway 64 ("the I-64 Project") in Missouri. The $438 million I-64 Project was funded both by the state of Missouri and the federal government. The project's general contractor, Gateway Constructors, subcontracted with Clark on March 11, 2007 to "provide hauling services" on a portion of the I-64 Project.

Clark's subcontract, titled "Project Hauling Agreement," specified that Clark's services were "subject to prevailing wages." It required Clark to "comply with all applicable laws, ordinances, statutes, rules and regulations, Federal, State, County, Municipal, pertaining to the Work, but not limited to, those regulations relating to wages." And it mandated that Clark "submit copies of certified payrolls for on-site hauling by law, rule or regulation." The Agreement included as an addendum federal form FHWA-1273, titled "Required Contract Provisions—Federal-Aid Construction Contracts." The addendum specified that "All mechanics and laborers employed or working upon the site of the work" had to be paid wages according to "the wage determination of the Secretary of Labor, … which is attached hereto, and made a part thereof, regardless of any contractual relationship … between the contractor or its subcontractors and such laborers and mechanics." But it was undisput-

ed at trial that no numerical hourly wage was attached to Clark's subcontract or specified therein.

About a year after Clark entered into the subcontract, however, the Missouri Highway and Transportation Commission issued a "wage order"—identified at trial as "Annual Wage Order No. 50"—which became incorporated into the contract. The actual wage order was not part of the record at trial, but (according to testimony) it mandated that employees be paid \$35.45/hour, Missouri's state prevailing wage (which, not coincidentally, was also the federal prevailing wage, as determined by the U.S. Secretary of Labor). Trial testimony provided by April Brown, the Missouri Department of Transportation ("MODOT") official who provided oversight of the I-64 Project for the state, established that there was some confusion during the project among subcontractors as to the prevailing wage that they were required to pay, because the wage rate was not expressly attached to their contracts. For reasons unclear from Ms. Brown's testimony, some contractors apparently had been led to believe that the prevailing rate was about three dollars less than \$35.45 and thus paid their employees that lesser wage until the wage order was issued and provided clarification. At that point, the confused subcontractors corrected their wage rate and reimbursed their employees accordingly.

Pursuant to Clark's subcontract—and the Davis-Bacon Act itself—on June 29, 2007, Clark began submitting certified payrolls to Gateway for each week of hauling services performed by his drivers. These forms are Department of Labor forms U.S.G.P.O. 1997 519.861, which expressly state that falsified information would subject the subcontractor to criminal prosecution pursuant to 18 U.S.C. § 1001. On each

submission, Clark listed the drivers under his employ and the numbers of hours that he had paid to each for the previous week, and averred that he had paid them $35.45/hour. As required by the form, Clark totaled the weekly wages he paid to his employees by multiplying $35.45 by the number of hours that each employee worked during the week at issue. Each payroll certification contained the following declaration:

> That any payrolls otherwise under this contract required to be submitted for the above periods are correct and complete; that the wage rates for laborers or mechanics contained therein are not less than the applicable wage rates contained in any wage determination incorporated into this contract; that the classifications set forth therein for each laborer or mechanic conform with the work he performed.

Clark, however, did not pay his drivers $35.45/hour. Instead, he individually contracted with each employee for roughly $15/hour. Testimony elicited from his drivers at trial demonstrated that his drivers knew that Clark was supposed to pay them the federal prevailing wage. It seems that they were happy to have the work, so they did not complain about being shortchanged.

Although Clark completed work on the project at the end of December, 2009, the I-64 project itself concluded in August 2010. The next month, on September 27, 2010, Clark signed a "Final Release and Waiver of Lien" for Gateway Constructors that included a statement that "All labor employed thereon or in connection [with the I-64 project] has been paid at the applicable prevailing wage rate." A year

later, on September 27, 2011, Clark was informed that MODOT required an affidavit, swearing compliance with Missouri state laws. Clark signed and submitted the affidavit, certifying that:

> [A]ll provisions and requirements set out in Chapter 290, Sections 290.210 through and including 290.340, Missouri Revised Statutes, pertaining to the payment of wages to workmen employed on public works projects have been fully satisfied and there has been no exception to the full and complete compliance with said provisions and requirements with Annual Wage Order No. 50 … issued by the Division of Labor Standards … .

Two months later, Clark was arrested. A U.S. Department of Labor investigation into another company that had worked on the I-64 project led DOL to search the offices of Clark Trucking and confiscate documents.

On December 14, 2011, based on that search and seizure, a grand jury in the Southern District of Illinois indicted Clark, charging him with ten counts of making false statements in violation of 18 U.S.C. § 1001(a)(3). Counts 1–9 concerned nine weekly payroll certifications that Clark submitted to Gateway during the project. Although Clark worked on the I-64 project from April 28, 2007 through December 26, 2009 (and submitted false payroll certifications weekly from June 29, 2007 through the project's completion), the government charged Clark with just nine counts related to the payroll forms—one count for each of the nine weeks running from August 30, 2009 through October 31, 2009. Count 10 concerned Clark's submission of his September 27, 2011 affi-

davit to MODOT regarding his compliance with Missouri wage laws.

Early on, the district court granted Clark's motion to dismiss for improper venue, but, in July 2013, we reversed in light of our determination that venue is proper in both the Eastern District of Missouri (where the false forms were filed) *and* the Southern District of Illinois (where Clark created the false payroll records and signed the affidavit). *United States v. Clark*, 728 F.3d 622 (7th Cir. 2013).

On remand, the case was tried to a jury. The government presented evidence that Clark was required to pay his employees the "prevailing wage," certified that he paid them $35.45/hour, but that he, in fact, did not. The government elicited testimony from two MODOT employees who spoke to their interactions with Clark. The government also put on an agent from the U.S. Department of Labor, John Borders, who testified that he discovered Clark's false certifications while investigating another company. Borders was the only witness from the federal government, and he did not testify about Clark's contract, the wage orders, or Clark's affidavit certifying compliance with Missouri law. Clark's defense focused on *mens rea*,[1] arguing that he lacked notice of the required prevailing wage—stressing that the U.S. Secretary of Labor's $35.45 figure was not expressly stated in Clark's contract and noting that there had been confusion among the other subcontractors regarding their precise wage obligation. Numerous Clark drivers testified that they were paid in the

_____

[1] "'[I]ntent to deceive' is an element of [section 1001]." *United States v. Ranum*, 96 F.3d 1020, 1033 (7th Cir. 1996).

neighborhood of $15. Yet, with one exception, each witness testified that he was satisfied with his pay and did not feel cheated by Clark. Nevertheless, the jury convicted him on all ten counts.

At sentencing, Clark disputed that his employees were "victims" entitled to restitution and, for purposes of the sentencing enhancement set forth in U.S.S.G. § 2B1.1(b)(1), that they suffered any "loss" as a result of his false statements. The government countered by arguing that (1) Clark's false statements to the government were part of a "scheme to defraud" his employees, that (2) an Application Note to the Guidelines stating a "special rule[]" for "case[s] involving a Davis-Bacon violation" governed the loss calculation, and that (3) "[i]f the offense had not been committed by the defendant, then each driver would have received the wages reported in the false certifications." In the government's view, both the U.S. government *and* the employees were victimized by Clark's conduct, and, consequently, Clark's employees should be compensated for the difference between the $35.45/hour Clark should have paid them and the roughly $15/hour that he did pay them.

Three of Clark's former employees, however, addressed the court through a letter or in person to express support for Clark and to deny that they had been victimized. Initially, the probation office took this same position, in light of the fact that Clark's drivers were not deceived (they were paid the rate for which they contracted with Clark) and because the same federal funds would have been expended regardless of the hourly wage that Clark paid his drivers. As such, the initial PSR deemed restitution inapplicable in this case. The government objected to probation's recommendation

and, in response, probation revised the report, ultimately characterizing Clark's employees as "victims" entitled to restitution and recommending that the district judge enhance Clark's offense level by 2 points under U.S.S.G. § 2B1.1(b)(2)(A) for offenses involving ten or more victims. (Over the nearly three years that Clark worked on the project, he employed 22 drivers in total.)

Both versions of the PSR (including the first version, which concluded that Clark's employees were not victims) determined that Clark's statements resulted in a "loss" to his twenty-two drivers in excess of $200,000 (calculated by multiplying the number of employee hours over the course of the project by $20—the rough difference between the $35.45 required wage and the $15 wage Clark paid his employees). This resulted in a 12-level enhancement to his offense level under U.S.S.G. § 2B1.1(b)(1)(G). Clark contested these determinations, arguing that his employees were not victims because they suffered no actual loss due to his false statements. But the PSR determined—and the district court agreed—that his drivers *did* incur losses, in part, based on Application Note 3(F) to U.S.S.G. § 2B1.1, which states: "In a case involving a Davis-Bacon violation (*i.e.,* a violation of 40 U.S.C. § 3142, criminally prosecuted under 18 U.S.C. § 1001) the value of benefits shall be considered to be not less than the difference between the legally required wages and actual wages paid." In the sentencing judge's estimation, if Clark had complied with the Davis-Bacon Act and paid his employees the $35.45 prevailing wage, his drivers would have been paid $20/hour more than Clark in fact paid them. Therefore, the district judge concluded that, even though Clark's convictions were for making false statements in violation of 18 U.S.C. § 1001 (Davis-Bacon Act violations are not

themselves criminal), that statute can be used as a vehicle for prosecuting Clark's failure to comply with the wage law. And that failure directly and proximately caused his employees actual monetary loss, the court ruled.

With a criminal history category of 1 and a base offense level of 6, the 12-level loss enhancement plus the 2-level number-of-victims enhancement resulted in a sentencing range of 33–41 months incarceration on each count. The district court sentenced Clark to 33 months incarceration on each count (to run concurrently), 3 years supervised release, a $1000 assessment, and $273,118.43 in total restitution to his 22 former employees.

On appeal, Clark challenges (1) his conviction on Count 10, arguing that the government failed to prove that his affidavit to MODOT was capable of influencing the *federal* government; (2) his convictions on Counts 1–9, contending, in effect, that his false payroll certifications did not concern a matter within the federal government's purview; (3) his restitution order, maintaining that his failure to pay his employees, not the after-the-fact false statements for which he was convicted, deprived his employees of income; and (4) the 12-level loss enhancement, (similarly) arguing that his false certifications neither caused nor were intended to cause his employees monetary loss.

## II. Discussion

### A. Materiality of the MODOT Affidavit

18 U.S.C. § 1001(a)(3) provides that "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully … makes or uses any false writing

or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry," faces criminal liability. In other words, the statute makes it a criminal offense to render a statement that: (1) is false, (2) is material, (3) is knowingly and willfully made, and (4) concerns a matter within the jurisdiction of a federal department or agency. *United States v. Turner*, 551 F.3d 657, 662 (7th Cir. 2008). For a statement to be *materially* false, it "must have 'a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *United States v. Gaudin*, 515 U.S. 506, 509 (1995) (quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988)). "We do not require the statement to *actually* influence the agency to which it was directed, or even that the agency rely on the statement in any way." *United States v. Lupton*, 620 F.3d 790, 806 (7th Cir. 2010). Rather, "[t]he 'central object' of the materiality inquiry is 'whether the misrepresentation or concealment was predictably capable of affecting, *i.e.,* had a natural tendency to affect, the official decision.'" *Turner*, 551 F.3d at 663 (quoting *Kungys*, 485 U.S. at 771). The government's brief, at least implicitly, agrees with Clark's position that—to be material—Clark's false statements had to be capable of influencing the U.S. Department of Labor.

In terms of the jurisdiction element, "[a] false statement may fall within section 1001 even when it is not submitted to a federal agency directly and the federal agency's role is limited to financial support of a program it does not itself directly administer." *United States v. Petullo*, 709 F.2d 1178, 1180 (7th Cir. 1983). "In such cases, the necessary link between deception of the non-federal agency and effect on the federal agency is provided by the federal agency's retention of the ultimate authority to see that the federal funds are

properly spent." *Id.* (internal citation and quotation marks omitted).

Clark concedes that his statements in the MODOT affidavit were false. He argues, though, that the government failed to introduce evidence at trial proving that his misstatements, which he submitted to a state agency and which concerned compliance with Missouri state law, were *materially* false. The government—again, accepting Clark's premise that for Clark's statements to be material, they had to be capable of influencing the *federal* Department of Labor—counters that Clark's statements concerning the wages he paid his employees satisfy materiality simply because the federal government had an interest in ensuring that the project's subcontractors paid their employees the federal prevailing wage.

Whether a statement is "material" is a fact question for the jury. *United States v. Beaver*, 515 F.3d 730, 740 (7th Cir. 2008). Normally, "[a] defendant who challenges the sufficiency of the evidence faces a daunting standard of review. In considering such a challenge, we view 'the evidence in the light most favorable to the Government, defer[] to the credibility determination of the jury, and overturn[] a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.'" *United States v. Carter*, 695 F.3d 690, 698 (7th Cir. 2012) (quoting *United States v. Perez*, 612 F.3d 879, 885 (7th Cir. 2010)). But as the government points out, Clark did not renew his motion for judgment of acquittal at the end of his trial. Therefore, "we will only reverse his conviction if we find a 'manifest miscarriage of justice' under the plain error standard of review." *United States v. Rea*, 621 F.3d 595, 601–

02 (7th Cir. 2010). Under either standard, though, if (as Clark claims) the government failed to put on *any* evidence from which a rational jury could find Clark's statements material, his conviction must be set aside. *See Rea*, 621 F.3d at 602 (noting that reversal is warranted under the demanding miscarriage of justice standard if the record is "devoid of evidence pointing to guilt") (citation omitted).

Turning to Clark's argument, we are unconvinced that statements made to a state agency (even ones concerning only state law) are incapable of influencing the federal government as a *per se* rule. *Cf. Petullo*, 709 F.2d at 1179 (affirming a false statements conviction where a contractor submitted false claims to the City of Chicago, which had received federal funds for snow removal). *See also United States v. White*, 270 F.3d 356 (6th Cir. 2001) (affirming a Section 1001 conviction where the defendants made false statements to the Kentucky Division of Water). Nevertheless, we agree with Clark that the government failed to prove how his statements to a state agency *in this case* had an ability to influence the federal government.

The government emphasizes that a false statement under section 1001 is material if it merely has the mere "possibility of influencing" a federal government agency, *Turner*, 551 F.3d at 659, and points out that the Sixth Circuit has described this as a "fairly low bar for the government to meet." *White*, 270 F.3d at 365. The government argues that it cleared this low bar by way of Government Exhibit 52, which it presented at trial and which the jury reviewed during its deliberation. Government Exhibit 52 is Form FHWA-1273, titled "Required Contract Provisions Federal-Aid Construction Contracts," which (as discussed earlier) was attached to

Clark's Hauling Agreement with Gateway Constructors. Again, one of the provisions contained in this document is a requirement that Clark had to pay his employees consistent with "the wage determination of the Secretary of Labor, … which is attached hereto, and made a part thereof, regardless of any contractual relationship … between the contractor or its subcontractors and such laborers and mechanics." According to the government, "common sense dictates that a false statement regarding the wages paid on [sic] contract ostensibly covered by the Davis-Bacon Act has the potential to influence the Department of Labor," because "[i]t is the Department's regulatory responsibility to ensure that the Davis-Bacon Act's prevailing wage requirements are consistently enforced on all federally-funded construction projects. And the right to cut off payments to a contractor is a very real, potentially very costly enforcement mechanism."

In fact, the U.S. Department of Labor had the authority—upon learning that employees of a subcontractor are being paid less than the U.S. Secretary of Labor's prevailing wage—to make a written request to MODOT, asking that it withhold "any accrued payments or advances as may be considered necessary" to pay the employees their owed prevailing wages. This was specified in addendum federal form FHWA-1273, titled "Required Contract Provisions—Federal-Aid Construction Contracts": "[t]he [state highway agency] shall upon its own action or upon written request of an authorized representative of the DOL withhold, or cause to be withheld, from the … subcontractor under this contract or … any other Federally-assisted contract subject to the Davis-Bacon prevailing wage requirements which is held by the same prime contractor, as much of the accrued payments or

advances as may be considered necessary to pay laborers or mechanics … ."

But the government appears to miss Clark's point. The affidavit Clark submitted to MODOT on September 27, 2011 swears only that he complied with "all provisions and requirements set out in Chapter 290, Sections 290.210 through and including 290.340, Missouri Revised Statutes, pertaining to the payment of wages to workmen" and with "Annual Wage Order No. 50" issued by the Missouri Highway and Transportation Commission. On its face, therefore, the form gives us no indication of its ability to affect the federal government. And the government submitted no evidence at trial that a federal agency or department ever received the affidavit, that the federal government viewed or considered the affidavit when disbursing federal funds or conducting project audits, or—more fundamentally—that it even knew that Missouri required such affidavits. Nor can any such inference be reasonably drawn; recall that Missouri collected this affidavit thirteen months after the project ended and twenty-one months after Clark completed his work on the project— long after he had been paid. Moreover, the only witness from the federal government to testify at trial (John Borders) made no reference to this affidavit in his testimony. And testimony from MODOT employee Ronald Morris made clear that the federal and Missouri wage orders are separate and distinct, despite both imposing an obligation to pay the same hourly rate.[2] For these reasons, we agree with Clark that the

---

[2] Note that thirty states, including Missouri, have their own prevailing wage requirement, which need not mimic the federal prevailing wage. "[N]othing in … the legislative history of the Davis-Bacon Act … sup-

government introduced no evidence from which a rational trier of fact could conclude that the contents of the affidavit were capable of influencing the decisions of the federal government beyond a reasonable doubt. Its failure to do so is fatal to its materiality argument.[3] Accordingly, we reverse Clark's conviction on Count 10.

---

ports [the] contention that Congress intended to preempt broader prevailing minimum wage requirements implemented by the states. As the Supreme Court acknowledged for the first time over fifty years ago: 'The language of the [Davis-Bacon] Act and its legislative history plainly show that it was not enacted to benefit contractors, but rather to protect their employees from substandard earnings by *fixing a floor under wages on* Government projects.'" *Frank Bros. Inc. v. Wisc. Dept. of Transp.*, 409 F.3d 880, 889 (7th Cir. 2005) (quoting *United States v. Binghamton Const. Co.*, 347 U.S. 171, 177 (1954)). Because the federal prevailing wage law is a floor, state laws can also add categories of workers to whom it applies. *Id.* ("[M]ost [state prevailing wage laws] contain categories of covered employees or prevailing wage rates which differ from the Davis-Bacon Act, *i.e.*, some states require that a prevailing wage be paid to one or more classifications of employees that are not covered under the Davis-Bacon Act.").

[3] The government spends much of its brief arguing that Clark conflates the elements of jurisdiction and materiality. In the government's view, Clark does not make a materiality argument at all, but rather—by noting that the MODOT affidavit does not concern matters within the U.S. Department of Labor's purview—wages an attack on the government's proof of section 1001's jurisdiction element. As an initial matter, we are skeptical that the jurisdiction element *is* satisfied here. Although federal funds were at issue during the project itself, Clark submitted his affidavit to MODOT (certifying only compliance with state law) long after the project's completion, and so, presumably long after federal funds were spent. The government makes no attempt to demonstrate how the MODOT affidavit could have affected those federal funds or implicated some authority delegated to MODOT by the federal government, which

### B. Materiality of Clark's Payroll Certifications

Clark also insists that the government failed to prove materiality concerning Counts 1–9. But he hinges his materiality argument not on whether his certifications had the ability to influence the federal government, but on whether he was contractually required to pay Davis-Bacon wages at all. The Davis-Bacon Act provides that "every contract in excess of $2,000" that involves the federal government "shall contain a provision stating the minimum wages to be paid various classes of laborers and mechanics." 40 U.S.C. § 3142. In Clark's view, a party to a contract that fails to specify the numeric federal prevailing wage cannot be bound to pay it. Moreover, Clark contends that the "only wage order mentioned during trial was Annual Wage Order 50, issued by the 'Missouri Highway and Transportation Commission.'" Therefore, Clark says, "even though the contract between Clark and Gateway Constructors does reference payment of a 'prevailing wage,' that rate (for purposes of Davis-Bacon) was not in the contract and there's no evidence it ever existed." As best we can tell, Clark's position seems to be that he

---

we have suggested is necessary to satisfy jurisdiction in this context. *See Petullo*, 709 F.2d at 1181 ("We think … at least in the emergency relief context it should be the *authorization* of federal assistance that triggers federal jurisdiction under the false statements statute. … [J]urisdiction … incorporates Congress' intent that the statute apply whenever false statements would result in the perversion of the authorized functions of a federal department or agency.") (internal citation omitted). Nevertheless, we agree with Clark that his argument speaks primarily to materiality—that is, that the government failed to put on evidence from which a rational factfinder could conclude that the statements in Clark's MODOT affidavit had the ability to *influence* the federal government.

was not contractually obligated to pay Davis-Bacon wages, and thus any misstatement concerning the wages he paid cannot possibly be material to the federal government.

As an initial matter, Clark cites no case law for the proposition that the federal numerical prevailing wage must be printed in a subcontractor's contract for Davis-Bacon to apply. And, as the government points out, Clark's contract did expressly state that he must pay his drivers the federal prevailing wage, as set forth by the U.S. Secretary of Labor. As it did with respect to Count 10, the government argues that Clark conflates the elements of materiality and jurisdiction. Here, though, we agree with the government. Clark does not argue that his false statements did not have a natural tendency to influence the Department of Labor (the standard for materiality), but instead—in effect—argues that the Department of Labor had no interest in Clark's statements about wages since (as Clark sees it) he was not contractually obligated to pay a federally-mandated wage. We find Clark's reasoning wholly unpersuasive.

Regardless of the Section 1001 element that Clark's argument purports to target, it is undisputed that in each payroll certification Clark expressly attested to paying his drivers $35.45/hour and that each form warned Clark that "a willful falsification of any of the above statements may subject the contractor or subcontractor to civil or criminal prosecution. See section 1001 of Title 18 and section 231 of Title 31 of the United States Code." Moreover, Clark's contract specified that he was subject to Davis-Bacon's requirements "regardless of any contractual relationship … between the contractor or its subcontractors and such laborers and mechanics." It is clear then that the government not only had an in-

terest in the information contained in these payroll certifica-
tions, but that a false statement on these forms had a natural
tendency to influence the federal government in some way.
And Clark knew that.[4]

In essence, Clark's argument is that the Davis-Bacon Act
did not apply to him, because the contract failed to state the
numeric prevailing wage. But he was not prosecuted for vio-
lating the Davis-Bacon Act; he was prosecuted under section
1001 for lying about the wages that he paid. And there's no
dispute that he did. Therefore, Clark's so-called materiality
argument speaks mainly to his *mens rea*—that is, his intent to
violate the Davis-Bacon Act itself. That was his unsuccessful
defense at trial, and Clark does not appeal the jury's finding.
Accordingly, we affirm Clark's convictions on Counts 1–9.

### C. Loss Caused by Clark's Misstatements

Clark argues that the district court misapplied 18 U.S.C. §
3663 and, thus, that his restitution order must be vacated.
We review the district court's statutory authority to issue a
restitution order de novo. *United States v. Hoskin*, 567 F.3d
329, 331 (7th Cir. 2009).[5] 18 U.S.C. § 3663 permits a district

---

[4] In addition to listing $35.45 on the payroll certifications as the hourly
wage Clark paid his employees, evidence at trial demonstrated that
Clark had conversations with his truck drivers, wherein he acknowl-
edged that he was supposed to be paying them the prevailing wage, but
that he felt that he was "paying them enough." As one of the employee
witnesses testified, it is commonly known by truck drivers that they are
entitled to be paid the federal prevailing wage on all government jobs.

[5] The government argues that, because Clark did not object to the restitu-
tion award at sentencing, the plain error standard of review applies.
Clark, however, points out that he challenged the characterization of his

court to order restitution to any victim of Clark's false statements. 18 U.S.C. § 3663(a)(1)(A). The statute defines "victim," as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered."[6] 18 U.S.C. § 3663(a)(2). Clark argues that his employees do not fit that description, because his mis-

---

employees as victims in his objections to the PSR, in his sentencing memorandum, and at the sentencing hearing. In any event, the government concedes that if plain error review applies, we may still vacate the restitution order if it "seriously affects the fairness, integrity or public reputation of judicial proceedings," *United States v. Randle*, 324 F.3d 550, 555 (7th Cir. 2003). Therefore, if we determine that the employees are not "victims," vacating the award would be appropriate under either standard.

[6] Clark repeatedly argues that the statute defines victims in two ways: (1) "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered," or (2) "in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." But the statute clearly says that "the term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered *including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern*." 18 U.S.C. § 3663(a)(2) (emphasis added). This is relevant because Clark argues that the government improperly advanced arguments to the district court that Clark engaged in a "scheme," and thus that the government was attempting to rely on the second definition of victim (which Clark says should not apply here). The statute makes clear, though, that—scheme or no scheme—only persons who are directly and proximately harmed by the charged offense may be considered victims.

statements did not directly or proximately deprive them of wages. Direct and proximate harm means that the loss would not have occurred "but for" the offense and that it was "foreseeable." *See United States v. Donaby*, 349 F.3d 1046, 1053–54 (7th Cir. 2003). Yet, as Clark says, he was convicted of lying to the government, not underpaying his employees. And, in his view, his lies did not cause his employees to be underpaid—they merely covered up the underpayments after the fact. As Clark puts it, "[r]egardless of [his] reports to agencies, his payments to his workers were what they were."

With respect to Count 10 concerning the MODOT affidavit (which, as outlined above, we vacate on materiality grounds in any event), Clark's argument has legs. He submitted the affidavit long after the project's completion and long after he and his drivers had been paid. However, that conclusion does not affect his restitution obligation, because Clark oversimplifies the issue with respect to Counts 1–9. As discussed earlier, the Addendum to Clark's Hauling Agreement acknowledges the authority of both the federal government and MODOT, upon learning of a subcontractor's failure to pay its employees the federal prevailing wage, to intervene and divert project funds earmarked for Clark to his undercompensated employees. We therefore agree with the government that Clark's false payroll certifications deprived the government of an opportunity to invoke this diversion mechanism and make Clark's undercompensated employees whole. Had Clark been truthful on the certification forms (listing the real hourly wage he was paying his drivers), his employees could have been fully compensated with funds that instead were paid to him. Accordingly, Clark's false statements proximately caused losses to his

employees in an amount equal to the difference between the wages he should have paid them ($35.45/hour) and the wages he in fact did pay them (roughly $15/hour). We therefore affirm the district court's restitution order.

### D. The 12-level Loss Enhancement

We review the district court's interpretation and application of U.S.S.G. § 2B1.1 de novo. *United States v. Johnson*, 612 F.3d 889, 892 (7th Cir. 2010). Loss, for purposes of the section 2B1.1 enhancement, can be based on either actual or intended losses, but the government relies exclusively on actual loss in defending the district court's $273,118.43 loss amount calculation. Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." § 2B1.1, App. n.3(A).

The parties' loss arguments mostly resemble their arguments on the topic of restitution. Clark argues that the district court improperly imposed a 12-level sentencing enhancement (which increased his guidelines range from 0–6 months to 33–41 months) based on a notion of loss that his reply brief deems "irrational." The government's position is that if we "concur[] in the district court's determination that the drivers were victims of Clark's crimes, then, logically, the difference between what the drivers were paid and what Clark said they were paid would be their loss." In the government's view, the district court's determination that Clark's false statements caused his employees actual loss of $273,118.43 is "[c]onsistent with basic reasoning and with Application Note 3(F)(iii) to U.S.S.G. § 2B1.1."

Application Note 3(F)(iii) reads: "In a case involving a Davis-Bacon violation (*i.e.*, a violation of 40 U.S.C. § 3142, criminally prosecuted under 18 U.S.C. § 1001), the value of

the benefits shall be considered to be not less than the difference between the legally required wages and actual wages paid." As the government sees it, this note makes the loss question a straightforward one. But the government seems to overlook that the Note expressly states that the "special rules" listed therein "shall be used to assist in *determining* loss." *Id.* (emphasis added). Application Note 3(F)(iii), therefore, speaks to *calculating* the loss amount, not in determining—without regard to basic cause and effect principles— whether the pecuniary harm *resulted* from the offense in the first place. Moreover, the application note refers to "benefits," not "losses," rendering its guidance even less certain. For that reason, we disagree with the government's suggestion (seemingly endorsed by the sentencing judge in this case) that any time a Davis-Bacon-related false statement is at issue, regardless of whether that statement actually caused loss, a sentencing judge must proceed as though it did.[7]

---

[7] For an order of restitution to be appropriate in the Section 1001 context, the *false statements*, not the conduct about which those statements concern, must have caused the loss. Comments made by the trial judge at sentencing, though, suggest some misunderstanding on this point. *See* Sentencing Tr. p. 27–28 ("The Court: Now, Davis Bacon doesn't contain any provisions for criminal remedies, so there has to be a vehicle – if there's going to be a criminal prosecution associated with Davis Bacon, there has to be some other vehicle to bring that prosecution, false statements … and in fact we have a Davis Bacon issue in this criminal case … so – there's no question that in terms of the legal concept of proximate cause, the workers received a difference in pay between the prevailing wage and what they actually got … so this is just – to me, this is just a common sense, ready-made situation that Davis Bacon sought to prevent."). We attribute this confusion to the government's choice to prose-

In this case, though—on account of the government's authority to halt payments to subcontractors upon learning that one's employees were being undercompensated—Clark's false payroll certifications *did* cause loss to his employees. The government never learned of Clark's underpayments because he lied throughout the project's duration, depriving the government of the opportunity to divert funds to his underpaid personnel and cheating Clark's employees out of their federally-mandated wages in the process. Therefore, Application Note 3(F)(iii) concerning loss *calculation* is both relevant and instructive. Although the Note discusses "benefits," not "loss," we read those terms to be the converse of each other in this instance; if Clark benefited in an amount equal to the difference between the prevailing wages he should have paid to his employees and those that he actually did pay them, then, of course, his employees suffered losses to that same tune. Accordingly, we conclude that Clark's false statements did, in fact, cause loss to his employees and that the district court properly applied Application Note 3(F)(iii) in calculating that loss amount.

---

cute Clark for making false statements, rather than for committing wire or mail fraud. That decision seems to have complicated not only matters at sentencing, but virtually every issue in this case—right down to the elements of the charged offense. Nevertheless, as we discuss, the sentencing judge's understandable confusion about the interplay of the Davis-Bacon Act and Section 1001 did not render Clark's sentence improper.

### III. Conclusion

For the foregoing reasons, we AFFIRM in part and REVERSE in part the judgment of the district court and remand for re-sentencing consistent with this opinion.