In the

# United States Court of Appeals

## For the Seventh Circuit

No. 23-3216

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANTHONY SABAINI,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cr-00813 — **Andrea R. Wood,** *Judge.*

ARGUED NOVEMBER 6, 2024 — DECIDED DECEMBER 10, 2025

Before BRENNAN, *Chief Judge,* and KOLAR and
MALDONADO, *Circuit Judges.*

KOLAR, *Circuit Judge.* Anthony Sabaini was a special agent
with Homeland Security Investigations (HSI), a unit of the
Department of Homeland Security that investigates drug traf-
ficking and money laundering. He used this position to steal
money from investigative targets, embezzle HSI funds ear-
marked for investigations, and enter a cash-for-protection re-
lationship with a confidential source. When Sabaini's

corruption came to light, the government charged him with filing false tax returns, structuring cash deposits to avoid detection, and concealing material information from the federal government. Sabaini was found guilty at trial and now appeals, arguing that there was insufficient evidence to support his conviction. We disagree and affirm the jury's verdict.

## I. Background

Sabaini's illicit dealings were discovered when his confidential informant, Gary Howard, was arrested by the DEA in July 2018. In searching Howard's phone, agents uncovered alarming text messages with Sabaini. The DEA referred the issue to the FBI. The FBI seized Sabaini's work phone in September 2018 and found that Sabaini had deleted all of his messages with Howard. Sabaini was removed from investigative duties in November 2018.

In 2020, Sabaini was charged with failing to report taxable income for the years 2014 to 2018 and "structuring" transactions to evade reporting requirements for certain bank deposits exceeding $10,000, in violation of 26 U.S.C. § 7206(1) and 31 U.S.C. § 5324(a)(3), respectively. Sabaini was also charged with concealing a material fact in violation of 18 U.S.C. § 1001(a)(1). That charge was based on Sabaini omitting information on his agency's forms to protect Howard. The thirteen-day jury trial occurred in 2023. As Sabaini now challenges the sufficiency of the evidence supporting his conviction, we recount the evidence adduced at trial.

The government presented evidence that Sabaini and his former HSI partner, Fernando Zambrano, routinely stole

money from drug dealers and informants.[1] For example, two brothers who were confidential sources for HSI testified that Sabaini set up an unauthorized drug deal between them and Howard in August 2015 for several kilos of cocaine. One brother delivered the drugs to Howard and received cash in a bag, which he gave to Zambrano. When Sabaini returned the bag later that night, the bills inside were different denominations and packaged differently. When asked about the different packaging, Sabaini held his hand up to his mouth, indicating the sources should stay quiet. Sabaini created no written report of this deal or seizure, a violation of HSI policy.

Another dealer testified that after selling about $25,000 worth of heroin, he returned to his apartment to find Sabaini waiting at his door. Sabaini then searched the apartment and seized the $25,000 and an additional $53,000 in cash, as well as other narcotics and jewelry. But Sabaini's own report following the incident documented seizures of narcotics and only $32,390 in cash—over $45,000 less than what was actually seized. The government presented evidence of similar discrepancies following a November 2016 traffic stop and a February 2018 drug seizure; Sabaini and Zambrano seized thousands in cash from dealers, but reported a far lesser sum (or none at all) in their later reports.

Sabaini not only preyed on criminal targets, but also pocketed HSI funds meant for law-enforcement operations. In January 2017, one of HSI's confidential sources purchased heroin

---

[1] Zambrano was charged with making false statements to a federal agent in a separate case and found guilty after trial; we affirmed that conviction in 2023. *United States v. Zambrano*, No. 22-2525, 2023 WL 8271682 (7th Cir. 2023).

from a drug trafficker on credit. Sabaini later gave the source counterfeit money to pay the drug trafficker for the heroin. But at trial, the government showed Sabaini requested $50,000 in *real* cash from HSI for a controlled buy of heroin and even signed a form indicating that the source had received the real money. Sabaini simply kept the real cash and passed fake bills onto the source.

The government further showed that Sabaini entered into a cash-for-protection arrangement with Howard, in which he pressured Howard to pay him in exchange for protection from HSI investigations. The jury saw texts between Sabaini and Howard from April 2016 in which Sabaini asked Howard for "50 words on a page"—code for $50,000. Howard texted back, "Okay I'm on it." That same month, purchase agreements, receipts, and checks showed that Sabaini used $25,310.60 in cash toward the purchase of two cars.

Not only were the car purchases themselves evidence that Sabaini received cash from Howard in April 2016, they showed that Sabaini knew of the cash reporting requirements that would later lead to the structuring charges against him. After Sabaini used more than $10,000 in cash to purchase the first of two cars in one installment, the dealer reported the transaction to the IRS and sent Sabaini notice that it had done so. This alerted Sabaini of the $10,000 threshold for mandatory cash deposit reporting, and he began to make cash deposits in smaller amounts following the dealer's notice.

There was also ample evidence that Sabaini protected Howard from investigation by other law enforcement. After a DEA confidential source purchased cocaine from Howard in January 2017, Sabaini told the source's handler that Howard was his "golden goose," and stonewalled the agent's efforts to

seek cooperation between Howard and the DEA. Likewise, when a different DEA analyst searched Howard's name and phone number, the search alerted Sabaini and he called the analyst to find out more about her investigation. The government showed that following this call, Sabaini texted Howard asking if Howard was using the searched phone number and instructed Howard to call him. Finally, the government showed the jury texts in which Sabaini warned Howard when and where law enforcement was planning operations.

Sabaini's corruption and *quid pro quo* with Howard was lucrative. Between 2014 and 2018, Sabaini deposited over $250,000 into a bank account opened in 2014, for which he was the sole account holder. Moreover, Sabaini structured his deposits precisely to avoid detection by law enforcement. The FBI case agent testified that the cash was deposited through 162 deposits made on 66 days from 2014 to 2018; every one of the deposits was under $10,000. The IRS agent testified that he noticed a change in Sabaini's behavior in April 2016, after Sabaini received notice that the dealership had reported that he used more than $10,000 in cash to buy a car. Before April 25, 2016, Sabaini would make deposits of over $2,000 on average; after April 2016, that average dropped in half to slightly over $1,000. Nor was this structuring a matter of coincidence: the government introduced evidence that Sabaini had investigated money laundering schemes at HSI and attended trainings on how to detect and investigate structuring.

Despite Sabaini's efforts to conceal these deposits, the government demonstrated through expert testimony from an IRS agent that Sabaini had unreported taxable income between 2014 and 2018. First, the IRS agent testified that the cash Sabaini had taken from confidential sources and investigations

was deposited but not reported as income (as it should have been) in his tax returns between 2016 and 2019. Then, using "indirect methods of proof," the IRS agent explained how Sabaini's cash expenditures and increase in net worth between 2014 and 2018 were inconsistent with the income reported in his tax filings for that period. Looking only at cash expenditures (the "cash method"), the agent concluded that Sabaini failed to report taxable cash income of $19,791 in 2014, $41,683 in 2015, $58,190 in 2016, $31,007 in 2017, and $6,139 in 2018. Looking at the increase in Sabaini's net worth (the "net worth method"), the agent approximated unreported income ranging from $2,095 in 2018 to $74,990 in 2016. Lastly, the IRS agent testified that there were no credible non-taxable sources of income that would have accounted for these inconsistencies.

In his defense, Sabaini introduced evidence that he had legitimate, non-taxable sources of cash income. His mother testified that Sabaini's late father had a collection of gold coins and cash that he intended to give to Sabaini. And Sabaini's wife corroborated that on a trip in July 2016, Sabaini's father gave them a box containing gold coins and cash. Sabaini himself testified that the box contained four types of gold coins from his father, of varying rarity, which he sold for cash between 2013 and 2015. He also testified that he had significant cash savings and that he had been reimbursed in cash for expenses related to the youth sports teams that he coached.

The government countered Sabaini's testimony about the gold coins by presenting records that showed Sabaini received checks, not cash, from his sale of gold coins. The government also introduced financial forms that Sabaini filled out from 2012 and afterward which did not disclose the alleged

coins or cash. Family members testified that they were not aware of Sabaini's father having had large amounts of cash or coins and the government submitted records showing Sabaini's father had taken out personal loans in the years before his death.

Hearing all this, the jury found Sabaini guilty on all seven counts. After the district court denied his post-trial motions for acquittal or a new trial and sentenced him, Sabaini appealed.

## II. Discussion

Sabaini appeals from both the denial of his Rule 29(c) motion for acquittal and his Rule 33 motion for a new trial, arguing that there was insufficient evidence to support the jury's verdict. Our review of a denial of a Rule 29 motion for acquittal is *de novo*, but "[w]e can neither reweigh the evidence nor reassess witness credibility." *United States v. Farmer*, 38 F.4th 591, 602 (7th Cir. 2022). Viewing the evidence in the light most favorable to the government, "[w]e will overturn a conviction only if … we determine that no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *United States v. Anderson*, 988 F.3d 420, 424 (7th Cir. 2021).

Rule 33 allows a district court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). We review the denial of a Rule 33 motion for abuse of discretion; these motions should only be granted in "the most extreme cases … in which consideration of the evidence leaves a strong doubt as to the defendant's guilt of the charged offense." *United States v. Peoples*, 119 F.4th 1097, 1101–02 (7th Cir. 2024) (cleaned up). "[A] court may properly

consider the credibility of the witnesses" on a Rule 33 motion, but because district courts are "best positioned to make this determination, our review is highly deferential." *United States v. Conley*, 875 F.3d 391, 399 (7th Cir. 2017).

## A. Unreported Taxable Income

To convict a defendant of filing false tax returns, the government must prove beyond a reasonable doubt that "(1) a person made or subscribed to a federal tax return which he verified as true; (2) the return was false as to a material matter; (3) the defendant signed the return willfully and knowing it was false; and (4) the return contained a written declaration that it was made under the penalty of perjury." *United States v. Perez*, 612 F.3d 879, 886 (7th Cir. 2010) (quotation omitted). Sabaini argues that his conviction cannot stand because the government failed to present sufficient evidence of unreported taxable income.

But the jury heard ample evidence at trial that Sabaini misappropriated cash from dealers and HSI in 2015, 2016, 2017, and 2018, and heard the IRS agent testify that such cash was unreported "income." Sabaini argues that the many witnesses—namely, the drug dealer targets—who testified to his thefts were not credible. But "it is well settled that this Court does not weigh in on credibility issues when reviewing a verdict" under Rule 29. *United States v. Cox*, 54 F.4th 502, 517 (7th Cir. 2022) (internal quotation omitted). And under Rule 33, we see no issues with the district judge's assessment of the credibility of the witnesses who supported the government's case; their testimony was corroborated by cash deposits documented in 2015, 2016, 2017, and 2018. In light of the direct evidence of Sabaini's unreported cash income from theft in 2015 through 2018, the district court properly denied Sabaini's

motions for acquittal and a new trial on the tax fraud charges for those years.

Sabaini's 2014 tax conviction, which is not supported by direct evidence of illegal activity that generated taxable income, requires a bit more analysis. Without direct evidence of unreported taxable income, the government can prove its case through indirect evidence of unreported income. Here, the government used two theories to do so: that Sabaini used more cash (the cash method) and had more assets (the net worth method) than his reported income would allow. *United States v. Hogan*, 886 F.2d 1497, 1508–09 (7th Cir. 1989) (cash method); *Holland v. United States*, 348 U.S. 121, 125 (1954) (net worth method).

The cash method of proof requires the government to establish the amount of cash the taxpayer had on hand at the beginning of the relevant period and to identify existing sources of cash. *Hogan*, 886 F.2d at 1510. The government tracks cash expenditures and cash from non-taxable sources of income in the same period. *Id.* at 1509. "If the cash expenditures exceed the sources, the tax expert infers that the taxpayer failed to report income." *Id.*

To use the net worth method of proof the government must establish with reasonable certainty the net worth of the defendant at the beginning of the relevant period. *United States v. Chu*, 779 F.2d 356, 361 (7th Cir. 1985) (quoting *Holland*, 348 U.S. at 132). Then the government must show that defendant's net worth at the end of the succeeding tax years increased, accounting for non-deductible expenditures such as living expenses. *Id.* (quoting *Holland*, 349 U.S. at 125). That increase in net worth is compared to the defendant's reported income; if the defendant's net worth increased more than

could be accounted for by reported income, then a "circumstantial conclusion" can be drawn that unreported income made up the difference. *United States v. Marrinson*, 832 F.2d 1465, 1469 (7th Cir. 1987).

For both methods, the government must either point to "a likely source" of the illegally unreported income or negate possible sources of non-taxable income offered by the defendant. *United States v. Massei*, 355 U.S. 595, 595–96 (1958) (per curiam); *Hogan*, 886 F.2d at 1509. To meet its burden in negating alternative sources of non-taxable income, the government must "track down relevant leads furnished by the taxpayer—leads reasonably susceptible of being checked"—that would establish the taxpayer's innocence by showing a non-taxable source of money accounting for the increase in net worth or usable cash.[2] *Holland*, 348 U.S. at 135–36; *Hogan*, 886 F.2d at 1510.

For the 2014 tax year, the government's case relied on these indirect methods of proof. The IRS agent testified that both the cash and net worth methods of proof established that Sabaini had unreported cash income for 2014—the cash method supported an amount of $19,791 and the net worth method suggested $13,780.

Sabaini provided two possible sources of non-taxable income: cash reimbursements for expenses he fronted as the coach of youth sports teams, and a cash and coin gift from his

---

[2] The fact that a defendant taxpayer provides relevant leads does not shift the burden of proof: "The Government must still prove every element of the offense beyond a reasonable doubt[.]" *Holland*, 348 U.S. at 138. But "[o]nce the Government has established its case, the defendant remains quiet at his peril." *Id.* at 138–39.

late father. Sabaini argues the government did not meet its burden to investigate "all relevant leads reasonably susceptible of being checked." *Chu*, 779 F.2d at 366 (cleaned up).

Sabaini's argument that the government did not sufficiently negate the possibility that he received significant cash from parents for expenses he fronted as a coach, particularly for 2014, is unpersuasive. At trial, a parent testified that in 2014 his child played on a tee-ball team coached by Sabaini and he did not recall Sabaini incurring significant expenses, nor did the parent reimburse Sabaini "substantial amounts of cash" for expenses. More broadly, the government presented witness testimony, stipulations, and documents showing that Sabaini had never received large amounts of cash through his involvement with any of his children's sports teams. The FBI case agent and the IRS agent testified that during their investigations, including interviewing parents of children Sabaini coached, only one parent claimed to reimburse Sabaini using cash during the indictment period; there was no indication Sabaini had received nearly $20,000 in cash reimbursements. There was sufficient evidence for a rational jury to conclude that Sabaini was not reimbursed thousands of dollars in cash during 2014, or throughout the indictment period.

Sabaini also posited that he received a large cash and coin gift from his father in 2012 and that he had sold the coins for cash. The government investigated this lead and undercut Sabaini's story in multiple ways at trial. First, family members testified they never knew Sabaini's father to have a large cash and coin collection. Second, officials from the United States Mint explained that some of the 1970s coins Sabaini claimed to have sold were not in production until 1986. And third, coin-store proprietors from the area had no records of buying

coins from Sabaini for cash. The government also reviewed financial documents from Sabaini and his parents, none of which disclosed a large stash of cash and coins.

This case is similar to *United States v. Blandina*, 895 F.2d 293, 294–96 (7th Cir. 1989), in which the defendant claimed that the increase in his net worth was attributable to a cash gift from his father and the sale of his father's coin collection. In *Blandina*, the government spoke with family members, and as here, some witnesses supported Blandina's story while others did not. *Id.* at 296. The government also spoke with local coin dealers and reviewed bank and financial records but was not able to verify Blandina's story. *Id.* at 302. We concluded "that the government fulfilled its obligation to investigate all relevant leads concerning a likely source of income furnished by the defendant that were reasonably susceptible of being checked" and affirmed the jury verdict. *Id.* at 303.

The same is true here: the government offered sufficient evidence of its reasonable investigation into the cash and coin gift. The investigation undermined Sabaini's story. Sabaini's defense presented a "factual jury question" and the jury rejected it. *See Marrinson*, 832 F.2d at 1471. The arguments Sabaini presents on appeal mirror those the jury rejected. We see no basis to disturb the jury's verdict.

### B. Structuring

Sabaini was also convicted of structuring, which is "altering the form of the [cash deposit] in order to avoid activating the bank's duty to file a currency transaction report." *United States v. Davenport*, 929 F.2d 1169, 1173 (7th Cir. 1991); *see also* 31 U.S.C. § 5324(a)(3); 31 C.F.R. § 1010.311. To sustain a guilty verdict on the structuring count, "the government must prove

only that a defendant had knowledge of the reporting requirements and acted to avoid them." *United States v. Van Allen*, 524 F.3d 814, 820 (7th Cir. 2008) (internal quotation omitted).

Sabaini was a federal agent who investigated money laundering. He was trained on structuring and trained others on how to spot structuring; he even touted his expertise in money laundering investigations on his resume. Accordingly, the record is replete with evidence that he knew more about a bank's reporting requirements—and how to evade them— than an average American. Sabaini deposited over $250,000 in cash via separate deposits made on 66 days but never once deposited more than $10,000 at one time.

Sabaini also changed his behavior after a stark reminder of the reporting obligations. After he was notified that his cash payment for a car was reported, he began to make smaller deposits. And the government played a video of Sabaini taking the time to deposit cash through multiple transactions in short order at a drive-through ATM. What's more, the jury saw the text messages between Howard and Sabaini indicating Howard gave Sabaini $50,000 in April 2016 and Sabaini subsequently made three cash deposits that totaled more than $10,000. Of course, each deposit was for less than $10,000. There was sufficient evidence for a jury to find that Sabaini knew of the reporting requirements and made structured cash deposits to avoid them.

Sabaini makes two arguments in response. First, he argues that the government did not submit evidence of behavior that meets the seven factors delineated by the Department of Justice for identifying structuring. But internal DOJ guidance is not a conferral of rights. *See United States v. Gillespie*, 974 F.2d 796, 800–02 (7th Cir. 1992) (prosecutor's failure to comply

with DOJ policy on grand jury testimony not basis to dismiss indictment); *see also United States v. Lopez-Matias*, 522 F.3d 150, 155–56 (1st Cir. 2008) (holding internal DOJ policy "not mandated by statute or the constitution" does not confer substantive rights) (internal quotation marks omitted). While these factors may help prosecutors identify structuring, they do not substitute for the elements of the offense.

Second, Sabaini argues that because his average deposit was between $1,000 and $2,000, it was not reasonable to infer that he had more than $10,000 in cash to deposit at any one point in time. But there is no legal requirement that the defendant must make close-to-but-not-quite-$10,000 deposits for the jury to infer that he wanted to avoid reporting requirements. Instead, "repeated transactions below $10,000 are evidence of intent to structure." *United States v. Malewicka*, 664 F.3d 1099, 1110 (7th Cir. 2011). We have affirmed a jury's reliance on a mix of facts, not just the amount of each deposit, to find the requisite intent to structure. *See, e.g.*, *Van Allen*, 524 F.3d at 820–21 (high volume of transactions for which defendant paid significant check-cashing fees was irrational and inefficient); *Malewicka*, 664 F.3d at 1109–10 (repeated withdrawals close in time, defendant's knowledge of reporting requirements, and amounts just less than $10,000); *United States v. Cassano*, 372 F.3d 868, 878–79 (7th Cir. 2004) (reporting requirements were common knowledge in defendant's business and defendant filled in the amount of each cashed check).

The evidence presented at trial showed Sabaini was trained in how to detect money laundering, including that suspects would structure their deposits to avoid detection. That unique expertise, the fact that Sabaini was stealing amounts of cash, and the timing and nature of the deposits

are together sufficient evidence to support Sabaini's conviction.

### C. Material Omission

The final charge against Sabaini was that he concealed material facts from the federal government in violation of 18 U.S.C. § 1001(a)(1). The government had to show that (1) Sabaini made a statement, or had a duty to disclose information; (2) the statement was false, or there were acts amounting to concealment; (3) the statement or concealed facts were material; (4) Sabaini made the statement or concealed the facts knowingly and willfully; and (5) the statement or concealed information concerned a matter within the jurisdiction of a federal department or agency. *United States v. Moore*, 446 F.3d 671, 677 (7th Cir. 2006).[3] Sabaini argues that his failure to disclose Howard's unauthorized drug deal with the DEA confidential source was not material to HSI's decision to make Howard a confidential informant. Sabaini also asserts he did not knowingly omit the information.

A statement or fact is material if it has "a natural tendency to influence, or [is] capable of influencing" the relevant federal agency action, regardless of whether the statement or fact

---

[3] While this appeal was pending, the Supreme Court issued *Thompson v. United States*, holding that 18 U.S.C. § 1014 requires statements to be false, not just misleading. 604 U.S. 408, 416–17 (2025). Sabaini was charged and convicted under a different statute, 18 U.S.C. § 1001(a)(1), which criminalizes not only false statements, but also "conceal[ing] or cover[ing] up by any trick, scheme, or device a material fact." *Thompson*'s analysis, which turned on statutory text that only penalized "false" statements or reports, is not relevant here. *See id.* Further, Sabaini was convicted of *omitting* material information, so the distinction between false and misleading statements is not relevant to this appeal.

actually influenced the action. *United States v. Clark*, 787 F.3d 451, 459 (7th Cir. 2015) (citation omitted). Materiality is a question of fact for the jury to resolve. *Id.* Both of Sabaini's supervisors testified that Sabaini should have disclosed that Howard had been arrested in January 2017 for participating in an unauthorized drug deal, and that they would have taken this arrest into consideration when deciding whether Howard should become a confidential informant. That is sufficient evidence in the record for a rational factfinder to conclude Howard's unauthorized drug deal was material to HSI's decision to deem him a confidential informant.

Contrary to Sabaini's argument, whether HSI would have still hired Howard as a confidential informant knowing of his January 2017 drug deal is not dispositive. *See Clark*, 787 F.3d at 459 ("We do not require the statement to *actually* influence the agency to which it was directed, or even that the agency rely on the statement in any way.") (quoting *United States v. Lupton*, 620 F.3d 790, 806 (7th Cir. 2010)). Sabaini's supervisors both testified that the fact would tend to influence their decision, and that is enough to support the jury's finding of materiality. *Id.* The jury was entitled to accept the commonsense assertion by HSI supervisors that unauthorized illegal activity would bear on their decision to make and keep Howard as an HSI confidential informant.

Finally, Sabaini's argument that the government did not provide sufficient evidence that he acted knowingly or willfully is unpersuasive. The jury saw significant evidence of Sabaini and Howard's mutually beneficial relationship. And it had evidence that Sabaini knew of the January 2017 drug deal and the FBI's investigation into Howard. There was sufficient evidence for the jury to find that Sabaini acted knowingly and

willfully when he failed to disclose that Howard had engaged in an unauthorized drug deal and was the target of the FBI investigation.

### III. Conclusion

The judgment of the district court is AFFIRMED.